[No. D008775. Fourth Dist., Div. One. Nov. 21, 1990.]

JOHN M. FLEMING, Plaintiff and Appellant, v.
RAY-SUZUKI, INC., et al., Defendants and Appellants.

[Opinion certified for partial publication.[1]]

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, IIC and IID.

**COUNSEL**

Raffee, Edwards & Leuthold and Richard R. Leuthold for Plaintiff and Appellant.

Charles S. LiMandri for Defendants and Appellants.

OPINION

**HUFFMAN, Acting P. J.**—John Fleming (Fleming) brought a contract and tort action against Ray-Suzuki, Inc., et al. (collectively Ray-Suzuki) based on Ray-Suzuki's violation of a covenant not to compete "in the United States." Judgment was entered on a jury verdict in favor of Fleming for restitution based on rescission, compensatory damages of $158,680, and punitive damages of $5,000. Fleming appealed from the trial court's denial of his request for $32,000 in attorney's fees, and Ray-Suzuki cross-appealed from the judgment, contending the jury instruction on covenants not to compete was erroneous, the parties' covenant not to compete was invalid, Fleming failed to state a cause of action for rescission, and there was no substantial evidence of fraud. We affirm the judgment.

### BACKGROUND TO THE LITIGATION

Ray-Suzuki, Inc. was a corporation which consisted of two divisions, Ray's Tennis Shop, a retail tennis shop on University Avenue in Hillcrest, and RAYCO, a world-wide mail order tennis business. Ray-Suzuki kept the shop and sold RAYCO to Fleming for $75,000 in cash and a $25,000 installment note. The bill of sale describes the assigned property as: "All rights and name of a certain mail order business known as RAYCO . . . together with Patent No. 4,040,268 of the United States for a Racket String Clamp and *seller's agreement not to compete in the same type of mail order business in the United States*. Also, all 800 number telephone numbers used for the mail order business, and all mail order customer lists." (Italics added.)

The amended escrow instructions recite, in relevant part: "Seller reserves the right to do business as retail outlet but is not to enter into the mail order business; however seller does have the right to mail to retail clients they [*sic*] now have."

The installment note has an attorney's fee clause.

The parties had a separate, oral agreement in regard to RAYCO's inventory. The agreement was for Ray-Suzuki to sell Fleming the inventory at cost and for Fleming to pay for the inventory out of the gross sales proceeds of the business.

In November 1984, about a month after escrow closed, Ray-Suzuki wrote between 100 and 200 of its former mail order customers, soliciting orders for the remaining inventory. One of Fleming's customers showed Fleming the letter. Fleming told Lynn Ray (Ray), who with his wife Hiroko owned

Ray-Suzuki, he would take legal action if Ray-Suzuki continued the mail order sales. Ray said he had to sell the inventory because he needed the money, and offered to give Fleming 10 percent of his gross proceeds. Fleming accepted the offer.

From June through October 1986, Ray-Suzuki placed the following classified advertisement in the monthly World Tennis magazine: "Used Ektelon stringing machines, bought and sold from $200. Write Ray's, 1434 University Avenue, San Diego, California, 92103. Call 619-295-5362." Fleming, who also sold stringing machines, complained to Ray about the ad.

While the ad was running, customers of Fleming's told him they had received mail orders and products lists from Ray's Tennis Shop. In August 1986 Fleming told Ray he wanted to cancel the balance of the $25,000 promissory note, which was then $17,000 or $18,000, because Ray was infringing on his territory. Fleming also told Ray he wanted Ray to get out of the mail order business entirely, and to give him, Fleming, Ray's new customer lists. Ray did not do so, and maintained he was not competing with Fleming.

On September 2, 1986, Fleming wrote Ray, enclosing his monthly payment on the note, and saying his "offer" would remain open until September 5. Ray responded by offering Fleming a partnership in Ray's new mail order business. Fleming wrote to Ray refusing the offer and asking Ray to meet him to resolve the matter.

In November 1986 Fleming received a letter from Ray's attorney stating the attorney had advised Ray-Suzuki it could engage in mail order solicitation and notifying Fleming it would be doing so in regard to some of its lines.

On February 24, 1987, Fleming's attorney wrote Ray asking him to stop all mail order activities and to make a full accounting of all gross sales proceeds. Ray's attorney responded with a letter stating the demand to stop mail order activities was too broad. Fleming's attorney renewed the demand. Ray's attorney asked Fleming's attorney to "clarify the terms of the sale" and to provide the relevant documents. Fleming's attorney did so. Ray's attorney did not respond.

Meanwhile, Ray-Suzuki ran monthly display ads in World Tennis, beginning with the February 1987 issue. The ads were very similar to Fleming's ads, listed many of the same products, and were often placed beside Fleming's ads. In addition, Ray-Suzuki continued to run the classified stringing

machine ad in World Tennis, placed ads in Tennis magazine for three months in 1987, and sent out a mailer in July 1987.

## THE LITIGATION

In May 1987 Fleming filed an action against Ray-Suzuki, Inc., Lynn and Hiroko Ray, and Ray's Tennis Shop for breach of contract, unfair business practices and unfair competition, breach of the covenant of good faith and fair dealing, fraud, misrepresentation, accounting, and injunctive relief. Fleming sought attorney's fees on the second (unfair business practices and unfair competition) count only, pursuant to Business and Professions Code section 17082.[2]

Ray-Suzuki answered the complaint and filed a cross-complaint for breach of contract, seeking the $14,865.90 allegedly owing on the note. In an amended cross-complaint Ray-Suzuki also sought attorney's fees.[3]

In November 1987 Fleming filed an amendment to his complaint, alleging a cause of action for rescission and restitution. Fleming sought recission of "the underlying transaction, Installment Note and Secutiry [sic] Agreement," plus damages, attorney's fees and costs.

Thereafter, the action proceeded to a jury trial.

At trial Ray testified he wrote the November 1984 solicitation letter because Fleming was not buying and paying for his inventory quickly enough, the letter did not violate his agreement not to compete with Fleming because the agreement said he was not to enter the mail order business and the purpose of the letter was to exit the mail order business, Fleming was "hopping mad" about the letter and "wanted to sue me right there and then," and Ray agreed he would not send out such a letter again.

Ray conceded he sent out a mailer in May 1986 which offered many of the items Fleming sold, but maintained he was not competing with Fleming because the item in the mailer which "really sold" was a Head Graphite Director racquet and Fleming didn't sell Graphite Directors. (Ray testified he bought 1,700 Graphite Director racquets from Head for $10 each and sold them all for $40 each, i.e., for a profit of over $50,000 ($30 x 1,700 =

[2] Business and Professions Code section 17082 recites, in relevant part: "In any action under this chapter [Unfair Practices Act] in which judgment is entered against the defendant the plaintiff shall be awarded a reasonable attorney's fee together with the costs of suit."

[3] The cross-complaint was apparently dismissed as the jury was instructed not to consider it.

$51,000). Ray said "we sold more of that racket in a shorter period of time than we have ever done with anything ever.")

Ray testified further the classified ad he ran in World Tennis in the summer of 1986 was not "soliciting anything by direct mail or anything. It's just opening a negotiation." Ray said Fleming was very upset about the ad and threatened to sue him, he tried to explain to Fleming a used stringing machine was not a mail order item, and Fleming did not tell him such machines were part of his, Fleming's, inventory.

Ray also testified Ray-Suzuki currently received sales orders "from all over the world," and placed ads in magazines and did mail order business as a result of the ads. Ray said, on the advice of counsel, he considered two years a reasonable period of time to wait before he re-entered the mail order market. He was asked how he or his counsel arrived at the two-year period. He answered, "That's a figure that I just arrived at on my own conclusion [because] I know that a mailing list is pretty much useless after two years."

Ray's gross income from mail order business was between $30,000 and $40,000 a month from January through October of 1987 and between $25,000 and $30,000 per month at the time of trial in July 1988.

At his deposition in October 1987 Ray was asked whether he thought he was competing with Fleming in the mail order business. He answered, "No . . . [b]ecause the bulk of my sales are in different products that he doesn't carry and because he is not competitive." He was asked, "Why do you think that he's not competitive?" He answered, "If you look at any of the tennis magazines, you will see that his prices are higher than anyone else's for the same item listed."

At trial Ray was asked why he felt he was not competing with Fleming by cutting prices. He answered, "Well, . . . it's a big ocean and we're two small fish. We really don't run into each other." He was asked, "Didn't Mr. Fleming want to keep you out of that ocean?" He answered, "Yes." He was asked, "Why do you think that you can come back into it?" He answered, "Because I waited a reasonable [two-year] period." Ray said he discussed the two-year period with Fleming before he sold RAYCO to Fleming, he could not think of any documents which referred to the two-year period, and he had not told Fleming after the sale he was going to re-enter the mail order business in two years.

Ray represented to Fleming before the close of escrow in October 1984 RAYCO had a net annual profit of $50,000. According to the Rays' personal income tax returns, in 1980 the net profit for RAYCO was $22,163, in

1981 it was $6,748, in 1982 there was a net loss of $16,892, in a seven-month period in 1983 there was a net profit of $13,332, and in the twelve-month period ending July 31, 1984, the net profit was approximately $30,000. At trial Ray was asked, "[H]ow did you get from $30,000 to net profit of $50,000 which you represented to Mr. Fleming? What adjustments were made, if any?" He answered, "I don't know. I have no idea. I consulted my accountant and we came up with the figure."

Fleming's income tax return for RAYCO for 1988 showed a loss of $26,205 from January 1 through June 30.

In a special verdict the jury unanimously found Lynn and Hiroko Ray had made a promise as to a material matter, at the time the promise was made "defendant" did not intend to perform it, Lynn (but not Hiroko) made the promise with the intent to defraud Fleming, Fleming was not aware of "defendant's" intention not to perform the promise, Fleming acted in reliance on the promise, Fleming was reasonably justified in relying on the promise, as a proximate result of his reliance on the promise Fleming was damaged in the total amount of $158,680, "the consideration for the obligation of the rescinding party fail[ed], in whole or in part, through the fault of the defendant Ray-Suzuki," and Fleming was damaged in the total amount of $158,680 by the failure of consideration.

Thereafter, in a nine-to-three verdict, the jury awarded Fleming punitive damages of $5,000.

Fleming filed a memorandum of costs which included $32,711.50 in attorney's fees. Fleming argued he was entitled to such fees under Civil Code section 1717 (contract provisions for attorney's fees) on the basis of provisions in the escrow agreement and the installment note (see *post*). Ray-Suzuki opposed Fleming's request for attorney's fees. At the hearing on the issue the trial court reasoned, because Fleming could recover compensatory damages only under one cause of action, fraud or rescission, he could not recover both punitive damages under the fraud cause of action and attorney's fees under the recission cause of action.

Thereafter, judgment was entered awarding Fleming $158,680 in "restitution based on rescission," $5,000 in punitive damages, and $2,810.43 in costs. The judgment also ordered Fleming, upon receipt of the $163,680 ($158,680 + $5,000), to make restitution to Ray-Suzuki by returning the trade name of RAYCO, the patent for a racquet string clamp, the 800 telephone numbers used for the mail order business, and the mail order customer list. The judgment was silent as to attorney's fees.

This appeal and cross-appeal followed.

DISCUSSION

I

FLEMING'S APPEAL*

. . . . . . . . . . . . . . . . . . . . .

II

RAY-SUZUKI'S APPEAL

A

The Jury Instruction

At Fleming's request, the court instructed the jury "[a] covenant not to compete will be enforced to the extent that it is reasonable and necessary in terms of time, activity and territory to protect the buyer's interest." The instruction was taken verbatim from *Monogram Industries, Inc.* v. *Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 698 [134 Cal.Rptr. 714].

In *Monogram*, the sellers of a portable toilet system agreed not to compete with the buyers "within the United States, Puerto Rico, the Virgin Islands and Canada." (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra*, 64 Cal.App.3d 692, 696.) The trial court issued an injunction paralleling the terms of the agreement and the sellers appealed, contending the territorial extent of the injunction was too broad and violated Business and Professions Code section 16601. That section recites, in relevant part: "Any person who sells the goodwill of a business, or any shareholder of a corporation selling or otherwise disposing of all his shares in said corporation, or any shareholder of a corporation which sells . . . (b) all or substantially all of the operating assets of a division . . . of the corporation together with the goodwill of such division . . . may agree with the buyer *to refrain from carrying on a similar business within a specified county or counties, city or cities, or a part thereof, in which the business so sold, . . . has been carried on*, so long as the buyer, . . . carries on a like business therein." (Italics added.)

The *Monogram* court affirmed the injunction, reasoning, in relevant part: "In the case of the sale of the goodwill of a business it is 'unfair' for the

---

* See footnote, *ante*, page 574.

seller to engage in competition which diminishes the value of the asset he sold. In order to protect the buyer from that type of 'unfair' competition, a covenant not to compete will be enforced to the extent that it is reasonable and necessary in terms of time, activity and territory to protect the buyer's interest. [Citation.]

". . . . . . . . . . . . . . . . . . . . ."

"We hold that in the provisions of Business and Professions Code section 16601 the area where a business is 'carried on' is not limited to the locations of its buildings, plants and warehouses, nor the area in which it actually made sales. The territorial limits are coextensive with the entire area in which the parties conducted all phases of their business including production, promotional and marketing activities as well as sales.

"Modular's production and marketing campaign established that it was 'doing business' on a nationwide scale . . . . *Considering the nature of the market being addressed by the parties, city, county or even state boundaries are not significant.* The injunction which is commensurate with the covenant appears reasonably necessary to protect Monogram's interest." (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra*, 64 Cal.App.3d 692, 698, 702, italics added.)

■ In opposition to *Monogram* Ray-Suzuki contends state boundaries *are* significant, because the regulation of interstate commerce is a matter of federal and not of state regulation. We find that argument to be inconsistent with his reliance on the state statute. If the state cannot regulate the part of the parties' agreement which involves areas outside of California, then Business and Professions Code section 16601 does not apply thereto, and Ray-Suzuki's argument that the statute precludes enforcement of the agreement would be without merit. We therefore reject this contention.

The challenge made to the covenant in *Monogram* was not on the basis the "counties and cities" language in Business and Professions Code section 16601 precluded the parties from agreeing not to compete outside the state, but on the basis the goodwill of the corporation at the time of the sale did not extend beyond an area bounded by Laguna Niguel and Los Angeles. (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra*, 64 Cal.App.3d 692, 701.)

Here, Ray-Suzuki does not contend the goodwill of RAYCO did not extend beyond California, and Business and Professions Code section 16601 does not, expressly or impliedly, preclude parties from agreeing not to compete outside the state.

We think the language of Business and Professions Code section 16601 limiting the scope of covenants to "counties and cities" cannot rationally be limited to California. *Monogram* upheld a covenant of national scope because it covered the area of business dealings represented by the goodwill which was sold. That analysis is applicable to this case and we find the scope of the covenant here included the "counties and cities" contemplated by Business and Professions Code section 16601. The territory encompassed here was merely an accumulation of those cities and counties impacted by the market area of the business which was sold.

■ Ray-Suzuki also contends the jury instruction was erroneous because it did not define competition. Relying on the statement in *Monogram* that "[t]he language of the section [16601] insures that the competition is in fact such and not simply insubstantial and infrequent or isolated transactions" (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra,* 64 Cal.App.3d 692, 698), Ray-Suzuki argues the omission of similar language in the instruction here deprived it of a key aspect of its defense. However, Fleming, who requested the instruction, was not required to educate the jury about Ray-Suzuki's defenses, and Ray-Suzuki apparently did not request any additional or alternative instructions on the competition issue. Accordingly, Ray-Suzuki's contention the instruction was erroneous because it did not address the defense evidence is without merit.

B

The Validity of the Covenant Not to Compete

■ Ray-Suzuki contends the covenant is invalid under section 16601 of the Business and Professions Code because Ray-Suzuki did not sell "all or substantially all of [the] operating assets" of its mail order division, as required by subdivision (b) of the statute (see *ante*).[4] Such unsold assets, Ray-Suzuki argues, were its mail order operation outside the United States, its mailings and sales to its retail customers, its location, its liabilities and bank accounts, its inventory, and Lynn Ray's managerial expertise. However, these so-called assets either were not operating assets of the mail order division or were not substantial.[5]

Ray-Suzuki compares Ray-Suzuki's (initial) retention of his inventory to the seller's retention of 18 percent of his stock in *Radiant Industries, Inc.* v. *Skirvin* (1973) 33 Cal.App.3d 401 [109 Cal.Rptr. 96]. In *Radiant*, the court

[4] If the covenant is invalid under section 16601, which is an exception to the general prohibition against covenants not to compete in section 16600, then the covenant is unenforceable.
[5] The inventory which remained at the time of sale is irrelevant because it was the subject of a separate, concurrent agreement.

held the covenant not to compete did not come within the provisions of Business and Professions Code section 16601 because the seller's retention of 18 percent of his stock violated subdivision (c) of the statute. (Subd. (c) provides the sale must be of *"all* of the shares" (italics added) of the subsidiary of a corporation.) However the term "all" in subdivision (c) is unqualified, and the term "all" in subdivision (b) is qualified by "substantially all." Accordingly, the cases are not comparable.

Ray-Suzuki also contends the covenant not to compete here is unlawful as it is unlimited in its territorial scope. However, the covenant in the bill of sale is not unlimited in territorial scope but is restricted to the territory of the United States. A covenant with an even broader territorial limit, encompassing the United States, Puerto Rico, the Virgin Islands, and Canada, was upheld in *Monogram.*

Finally, Ray-Suzuki contends, without elaboration, the injunction portion of the judgment must be dissolved because it is broader than either of the covenants not to compete. Not so. The judgment enjoined Ray-Suzuki and its agents from "competing in the 'mail order' business of selling tennis products in the United States" pending payment to Fleming. In the bill of sale Ray-Suzuki agreed "not to compete in the same type of mail order business in the United States," and in the amended escrow instructions Ray-Suzuki agreed "not to enter into the mail order business." The injunction not to compete in the mail order business of selling tennis products in the United States is clearly narrower than the agreement in the amended escrow instructions not to enter into the mail order business at all.

C, D*

. . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Froehlich, J., and Lim, J.,† concurred.

A petition for a rehearing was denied December 19, 1990, and the petition of defendants and appellants for review by the Supreme Court was denied February 21, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

* See footnote, *ante,* page 574.
† Assigned by the Chairperson of the Judicial Council.