[No. B046336. Second Dist., Div. Three. Apr. 2, 1992.]

VACCO INDUSTRIES, INC., et al., Plaintiffs and Respondents, v.
TONY VAN DEN BERG et al., Defendants and Appellants

COUNSEL

Limbach, Limbach & Sutton, John P. Sutton and Peter G. Carroll for Defendants and Appellants.

Browne & Woods, Allan Browne and Laura Seraso for Plaintiffs and Respondents.

OPINION

**CROSKEY, J.**—Defendants and appellants Tony Van Den Berg (Van Den Berg), Thomas Eastlack (Eastlack) and Kamer Solenoid, Inc., a California corporation (Kamer; collectively defendants) appeal from a judgment entered against them following a jury verdict in favor of the plaintiffs and respondents Vacco Industries, Inc., a California corporation (Vacco) and

Emerson Electric Co., a Missouri corporation (Emerson; collectively, plaintiffs). Plaintiffs were awarded compensatory and punitive damages, as well as injunctive relief, for defendants' misappropriation of plaintiffs' trade secrets. In addition, plaintiffs received a posttrial award of attorney fees in the sum of $526,360. We affirm the judgment after striking the portion of the fee award which was based on the third party tortfeasor doctrine. The award of fees under that doctrine was both procedurally and substantively incorrect. Such fees may not be awarded by the court on a posttrial motion, but rather are damages subject to pleading and proof before the trier of fact. As to the substantive issue, this is essentially a "two-party" lawsuit and an award of fees under the third party doctrine is not legally justified.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Van Den Berg went to work for Vacco in November of 1961. During his tenure, which ended in February 1984, he held a number of positions, including truck driver, machinist, technician and engineer. By the early 1980's he had worked his way up to the position of operations manager and was an officer of the corporation. He also periodically purchased Vacco common stock and ultimately acquired approximately 3 percent of the outstanding shares.

Vacco, during the period of Van Den Berg's employment, was engaged in the highly competitive business of developing, designing, producing and marketing technologically complex products for the military and the aerospace, petrochemical and nuclear power industries. Several of those products are specifically relevant to this action:

1. A so-called "quiet manifold" which was utilized by the United States Navy on its nuclear submarines. Vacco developed this product utilizing its own technology and development money over a two and one-half year period;

2. A three-way bypass valve, used on board submarines and surface craft belonging to the United States Navy, which controlled the movement of high pressure steam essential to the Navy's propulsion systems; and

3. Filters (consisting of stacked metal discs) utilized by private and governmental customers to filter contaminants.

---

[1]Quite apart from our obligation to review the evidence presented in a jury trial in the light most favorable to the successful party (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289), there is essentially no dispute as to the underlying facts. Defendants, in their reply brief, concede the facts, as outlined in the plaintiffs' brief, are correct and that the claimed errors made by the trial court are errors of law.

Each of these products was produced by the use of Vacco's manufacturing and engineering technology, engineering notes, initial, preliminary and final drawings, quality controls and testing procedures.[2] Vacco considered all of this information to be proprietary and confidential and it undertook reasonable efforts to keep it secret. These efforts included (1) extensive internal controls (e.g., visitor logs, sign-out sheets for proprietary documents and a document destruction policy), (2) availability and required use of locked storage cabinets in the engineering department and (3) strict security control measures with respect to documents which necessarily had to be made available to third party vendors or subcontractors.[3] Engineering notes were never made available to third parties nor were detailed plans or drawings which Vacco used in the manufacturing process.

Eastlack joined Vacco in January 1975 and remained with the company until early 1983. During this period of time he served as a contracts manager and monitored the cost and scheduled performance of contracts with Vacco customers. He thus gained substantial personal knowledge concerning a large number of Vacco products, including those which are particularly relevant here, and communicated directly with a number of Vacco customers regarding those products.

On August 2, 1983, Vacco entered into an agreement with Emerson in which Emerson agreed to purchase all of Vacco's stock at a price of $27.81 per share for a total purchase price of approximately $23 million for all of the outstanding shares. Apparently in anticipation of this sale, Vacco entered into employment contracts with a number of key employees, and separate noncompetition agreements with 12 major shareholders. Van Den Berg's employment contract was signed on August 17, 1983. He entered into the noncompetition agreement on September 23, 1983. Although these agreements were expressly motivated by and directly and integrally dependent

---

[2]For example, for the "quiet manifold" product, Vacco had literally hundreds of drawings including (1) top assembly drawings (which reflect *all* of the component parts but do not show *how* to make them), (2) subassembly drawings (which show *some* of the component parts but not *how* to make them) and (3) detailed manufacturing prints or drawings (which are used to manufacture each of the quiet manifold's component parts). These detailed drawings are *essential to the manufacturing process.*

[3]For example, such documents as were temporarily released to outside third parties contained the following restrictive legend: "THIS DRAWING, PRINT OR DOCUMENT AND SUBJECT MATTER DISCUSSED HEREIN ARE PROPRIETARY ITEMS TO WHICH VACCO INDUSTRIES RETAINS THE EXCLUSIVE RIGHT OF DISSEMINATION, REPRODUCTION, MANUFACTURE, USE AND SALE. THIS DRAWING, PRINT OR DOCUMENT IS SUBMITTED IN CONFIDENCE FOR CONSIDERATION BY THE RECIPIENT ALONE UNLESS PERMISSION FOR FURTHER DISCLOSURE IS EXPRESSLY GRANTED IN WRITING BY VACCO INDUSTRIES."

upon the stock sale to Emerson, neither cross-referenced or referred to the other.[4]

Under the terms of the noncompetition agreement Van Den Berg acknowledged that he was selling *all* of his shares of Vacco stock to Emerson and he agreed that he would not carry on any business competitive with the business of Vacco for the *lesser* of (1) five years from the date of the agreement or (2) "so long as Vacco conducts the Business within the territory."[5] Contemporaneously with his execution of this agreement, Van Den Berg sold all of his shares to Emerson and was paid the sum of $500,000.

In spite of the provisions of his employment agreement, Van Den Berg was terminated in February 1984.[6] While there was evidence at trial that he had misappropriated company funds for his own personal use and that was why Vacco had terminated him, that was disputed by Van Den Berg. The evidence which he produced showed that such reason by Vacco management was false or pretextual and that his termination was wrongful. As the jury accepted Van Den Berg's evidence as persuasive, and found for him on his cross-complaint (see, *post*), we accept that he was wrongfully terminated from his job.[7]

Just prior to his termination, Van Den Berg and Eastlack, who had left Vacco earlier, acquired all of the stock of Kamer.[8] At the time, Kamer was engaged in the business of manufacturing solenoid products and had for a number of years been a subcontractor to Vacco, but had never sold products in competition with Vacco. The evidence at trial showed that prior to his termination Van Den Berg had also done the following:

---

[4]An examination of the employment agreement reflects that it also contained a "noncompetition" commitment in the event of employment termination. However, we do not consider that agreement here. First, it was signed by Van Den Berg as *an employee* and differs in significant ways from the subsequent and clearly relevant noncompetition agreement signed by him *as a selling shareholder*; second, it is of questionable validity under Business and Professions Code section 16600; and finally, it was not argued by the parties and apparently was not considered by the trial court.

[5]The term "territory" was defined as the territorial limits of the United States of America.

[6]Under the terms of his employment agreement, which was only to be effective if the stock sale to Emerson were concluded, Van Den Berg was to be employed for a period of three years at a salary of $80,000 per year. He could only be terminated for specified causes. One of those causes was relied upon by Vacco, but was found by the jury to have been pretextual.

[7]However, the jury did not find that Vacco had breached the employment agreement in terminating Van Den Berg before the expiration of the specified three-year term. They simply found that Vacco was guilty of "wrongful termination." In effect, the jury found a breach of the implied covenant of good faith and fair dealing. Under *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 697-700 [254 Cal.Rptr. 211, 765 P.2d 373], this would entitle Van Den Berg to the same relief to which he would have been entitled if a breach of contract had been found, to wit, contract damages. Presumably, the amount awarded to him constituted the jury's valuation of such damages.

[8]The name of Kamer was subsequently change to Velk Industries, Inc.

(1) In the summer of 1983, received at his home from his brother Jacob Van Den Berg, who was then employed by Vacco (but later became an employee of Kamer), two boxes containing a complete set of *all* of Vacco's proprietary plans and drawings, including those for the quiet manifold;

(2) About six months prior to his termination, Van Den Berg instructed Vacco employees to break the welds on numerous "quiet elements" (a critical part of the quiet manifold) and put each subpart of each element on a labelled index card with a pertinent description so that a complete configuration of each different quiet element would be set forth on the card;

(3) In June or July of 1983, Van Den Berg told a fellow officer and shareholder that he had taken quiet manifold detailed plans and drawings so that he could go into the Vacco "spare parts" business.

Following his termination and several weeks after he and Eastlack had acquired the stock of Kamer, Van Den Berg, on behalf of Kamer, began to directly solicit Vacco customers and to sell those customers products in competition with Vacco. For example:

(1) Contracts were entered into with the United States Navy to sell the same three-way bypass valve which Vacco was also selling;

(2) In 1984, 1985, and 1986 offers to the United States Navy were made to sell quiet manifolds and component parts therefore. In June of 1984, defendants offered to design and produce *all* of the parts of the quiet manifold *and* a complete set of drawings for all of the quiet manifolds in 180 days. Evidence at trial showed that (a) it took Vacco 300 days to produce the manifolds without regard to the time necessary to prepare the drawings and (b) it would be impossible to design and build a quiet manifold without using Vacco's drawings; and

(3) Sometime after he left Vacco's employ, Van Den Berg designed a drawing for a pilot-operated control device to meet a customer's specifications. The bid file maintained by Kamer for that customer contained, *at the time Van Den Berg prepared the drawing*, a preliminary Vacco drawing with engineer's notes for the same product. The Vacco drawing contained a proprietary legend (see fn. 3, *ante*) and substantial evidence reflected that Vacco had never authorized the transmission of this drawing to either Kamer or Van Den Berg.

On March 5, 1985, plaintiffs commenced this action seeking damages for (1) breach of Van Den Berg's noncompetition agreement, (2) breach of the

implied covenant of good faith and fair dealing, (3) unfair competition, (4) misappropriation of trade secrets, (5) breach of fiduciary duty, and (6) interference with business relations. Defendants filed an answer and a cross-complaint in which they sought damages for (1) interference with business relations, (2) breach of Van Den Berg's employment contract and (3) wrongful termination of Van Den Berg.

After completion of discovery and a spate of inconclusive law and motion proceedings the case went to trial on May 15, 1989, on the issues raised by these competing pleadings. The jury returned a verdict which resulted in a near standoff between the parties.[9]

(1) The jury concluded that Van Den Berg had breached his noncompetition agreement and that the three defendants had misappropriated Vacco's trade secrets, engaged in unfair competition and breached their fiduciary duties. Compensatory damages totalling $15,442 were awarded. In addition, the jury found that punitive damages were appropriate and awarded the total sum of $17,500, payable $10,000 by Van Den Berg, $5,000 by Eastlack and $2,500 by Kamer.

(2) The jury also found that Van Den Berg had been wrongfully terminated and awarded him $24,500 in damages against Vacco on his cross-complaint.

Subsequent to the jury verdict, the trial court denied defendant's motion for judgment notwithstanding the verdict, but did grant plaintiffs' motion for (1) an injunction against defendants and (2) attorney fees under the Uniform Trade Secrets Act (Civ. Code, §§ 3426-3426.10) as provided in Civil Code section 3426.4[10] and under the third party tortfeasor doctrine. (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645].) Defendants had opposed the request for injunction on the ground that Vacco's wrongful termination of Van Den Berg barred such relief under the doctrine of "unclean hands." The trial court rejected this argument on the principle that the doctrine does not apply to misconduct unconnected with the matter in litigation and that Van Den Berg's termination had no relevant connection with the grounds for injunction.

---

[9]There were three other defendants against whom plaintiffs also sought relief: Smooth-Pore Filtration Systems, Inc., Robert Lucas and Jacob Van Den Berg. However, the jury found in favor of these defendants on all counts and they were awarded judgment and costs. They are not parties to this appeal.

[10]Civil Code section 3426.4 provides: "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or *willful and malicious misappropriation exists*, the court may award reasonable attorney fees to the prevailing party." (Italics added.)

Defendants resisted the award of attorney fees on the grounds that (1) Vacco was not the prevailing party and was not entitled to fees, (2) there was no statutory basis for fees and (3) fees under the *Prentice* rule were "damages" which had to be pled and proven before the jury, not determined by the judge in a posttrial motion. Again, the trial court disagreed and concluded that the jury's determination to award punitive damages was sufficient to permit the court to conclude that the misappropriation was willful and malicious. Thus, an award of fees under Civil Code section 3426.4 was justified. The sum of $175,453.33 was awarded jointly against the three defendants. In addition, the court ordered the sum of $350,906.67 to be paid by Van Den Berg alone under the third party tortfeasor doctrine. However, the court's order provides no factual or legal justification for this award other than the introductory comment that "no issue is taken with the apportionment between the claims under CC 3426.4 and the *Prentice* theory" (italics added). The court did not acknowledge or discuss the objections raised by Van Den Berg as to this portion of the fee award.

The trial court signed the final judgment on September 7, 1989, and defendants have prosecuted this timely appeal.

### ISSUES PRESENTED

As we have already noted, there seems little dispute that substantial evidence supports the conclusions reached by the jury. Indeed, neither party makes any serious argument to the contrary. The issues that are presented to us are purely legal and we characterize them, although somewhat differently than the articulation by the parties, in the following manner:

1. Is Van Den Berg's noncompetition agreement enforceable? This necessarily involves a consideration of the impact of Vacco's wrongful termination of Van Den Berg's employment and the applicability of Business and Professions Code section 16601.

2. Did Vacco have protectible trade secrets?

3. What impact did Vacco's wrongful termination of Van Den Berg have on defendants' liability?

4. Is there a proper basis for the award of attorney fees?[11]

### DISCUSSION

As we have already noted, defendants essentially concede that substantial evidence was presented to support the trial court's factual determinations.

---

[11] In their reply brief, defendants also raise the issue that the $17,500 awarded in punitive damages was not supported by substantial evidence of their financial condition. Such evidence is now required by the recent decision of our Supreme Court in *Adams* v. *Murakami* (1991) 54 Cal.3d 105, 116, 123 [284 Cal.Rptr. 318, 813 P.2d 1348]. We raised this question at

The principal position they take here, as they did in the trial court, is that, *as a matter of law*, plaintiffs had no trade secrets to be misappropriated and they had no obligation not to compete. They contend that the noncompetition agreement was void and that the products which they sought to sell were not subject to trade secret protection. They also argue that Vacco's wrongful termination of Van Den Berg bars any relief and that there is no legal basis for the award of any attorney fees. We discuss each of these contentions.

### 1. *The Noncompetition Agreement Is Enforceable*

Business and Professions Code section 16600 provides that, subject to certain exceptions, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Based on this statutory proscription, Van Den Berg argues that his agreement not to compete with Vacco for a period of five years after the sale of his stock is invalid and unenforceable.

However, one of the statutory exceptions to this rule is set forth in Business and Professions Code section 16601.[12] That section permits agreements not to compete made by a party selling the goodwill of a business or *all* of the shares of stock in a corporation. That, of course, is just what Van Den Berg did here. He sold all of his stock in Vacco and was paid $500,000. Sections 16600 and 16601 are codifications of the common law and are to be construed and interpreted reasonably in light of the common law decisions on the same subject. (*Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 68-69 [167 Cal.Rptr. 183].) At common law, a restraint against competition was valid to the extent it reasonably

---

oral argument and invited the parties to submit postargument supplemental briefs which we have received and considered. Assuming, arguendo, that *Adams* has retrospective application (*Douglas* v. *Ostermeier* (1991) 1 Cal.App.4th 729, 740-745 [2 Cal.Rptr.2d 594]), we are satisfied that sufficient evidence of the financial condition of each of the defendants was presented during the trial so as to justify and support the relatively small award of punitive damages which was made in this case. As the only issue raised by defendants with respect to punitive damages went to this limited question, we conclude that their objection to the award is without merit.

[12]Business and Professions Code section 16601 provides in pertinent part: "Any person who sells the goodwill of a business, or any shareholder of a corporation selling or otherwise disposing of all his shares in said corporation, or any shareholder of a corporation which sells (a) all or substantially all of its operating assets together with the goodwill of the corporation, (b) all or substantially all of the operating assets of a division or a subsidiary of the corporation together with the goodwill of such division or subsidiary, or (c) all of the shares of any subsidiary, *may agree with the buyer to refrain from carrying on a similar business within a specified county or counties, city or cities, or a part thereof, in which the business so sold, or that of said corporation, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or shares from him, carries on a like business therein. . . .*" (Italics added.)

provided protection for a valid interest of the party in whose favor the restraint ran. (*Monogram Industries, Inc.* v. *Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 698 [134 Cal.Rptr. 714].)

The purchaser of a business is entitled to negotiate and enforce an agreement by the seller(s) of the business imposing a reasonable restriction on competition by the seller(s) on the theory that such competition would diminish the value of the business which had been purchased. "In order to protect the buyer from that type of 'unfair' competition, a covenant not to compete will be enforced to the extent that it is reasonable and necessary in terms of time, activity and territory to protect the buyer's interest. [Citation.]" (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra,* 64 Cal.App.3d at p. 698; see also *Fleming* v. *Ray-Suzuki, Inc.* (1990) 225 Cal.App.3d 574, 581-582 [275 Cal.Rptr. 150].)[13]

 Van Den Berg argues that this exception to the general rule should not apply to him because he was not a "substantial shareholder." He stresses that he owned less than 3 percent of Vacco's stock and received only $500,000 of the $23 million purchase price. He relies on *Bosley Medical Group* v. *Abramson* (1984) 161 Cal.App.3d 284 [207 Cal. Rptr. 477], where the court held that the exception of section 16601 was intended to apply only to the sale of such a substantial portion of the stock as would permit the conclusion that the corporation's good will had also been transferred. (*Bosley, supra,* 161 Cal.App.3d at pp. 289-290.) However, that rule must be read in light of the factual context in which *Bosley* announced it. A Dr. Abramson was hired by the Bosley Medical Group and was required to purchase about 9 percent of the corporation's shares. His employment agreement required him, upon termination, to resell his stock and as part of such resale he would agree not to compete for three years. The court found that this agreement was a transparent sham designed to get around the statutory proscription in Business and Professions Code section 16600 and refused to enforce it. The purpose of this agreement made little sense except as a device to prevent Dr. Abramson from competing with Bosley.

*Bosley* has no application here. First, there was nothing sham about the purchase of Van Den Berg's stock. The purchase was not a device to impose

---

[13]Business and Professions Code section 16601 describes the permissible territory as "a specified county or counties, city or cities, or part thereof, . . . " However, it has not been so limited by case law. Covenants have been approved with defined territories extending beyond California and, indeed, to the entire country. (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra,* 64 Cal.App.3d at pp. 698, 702; *Fleming* v. *Ray-Suzuki, Inc., supra,* 225 Cal.App.3d 574, 582.) As the *Monogram* court put it, "We hold that in the provisions of Business and Professions Code section 16601 the area where a business is 'carried on' is not limited to the locations of its buildings, plants and warehouses, nor the area in which it actually made sales. The territorial limits are coextensive with the entire area in which the parties conducted all phases of their business including production, promotional and marketing activities as well as sales." (*Monogram, supra,* 64 Cal.App.3d at p. 702.)

an otherwise illegal restraint upon his future commercial activities. Second, Van Den Berg was, in the context of this transaction, a substantial shareholder. He was the ninth largest shareholder in the corporation and was one of its principal officers. The purchase of his stock was essential to Emerson's stated goal of acquiring *all* of Vacco's stock. Even assuming *Bosley* correctly imposes a substantiality test, it was clearly satisfied here.

■ Van Den Berg next argues that Vacco's wrongful termination of his employment, in violation of the August 17, 1983, employment agreement, discharged his contractual obligations to Vacco and Emerson under the noncompetition agreement of September 23, 1983. We disagree. There is nothing in this record to suggest that these two separate agreements imposed dependent obligations or that the performance of the one was a condition of an obligation to perform the other. Indeed, the noncompetition agreement, as a practical matter, necessarily contemplated that Van Den Berg's employment would at some point be terminated. If such termination was wrongful, or in breach of the employment agreement, Van Den Berg would have a clear remedy in contract.[14] There is no justification for also excusing him from performing his promise not to compete with Vacco for a reasonable period following the sale of his stock which was given in exchange for the purchase of that stock, a matter quite apart from his employment. Finally, there is no reason to believe that any of the parties considered performance of the obligations under these two agreements as dependent. (See generally, 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 756, pp. 687-688.) The damage award Van Den Berg received for the wrongful termination fully compensated him.

We therefore conclude that the noncompetition agreement is not prohibited by Business and Professions Code section 16600 and is fully enforceable in spite of Vacco's prior wrongful termination of Van Den Berg.

2. *Vacco Had Protectible Trade Secrets Which Were Misappropriated by Defendants*

■ Defendants apparently do not dispute that they utilized Vacco's product designs in order to engage in a competitive business. They do contend, however, that Vacco did not have any protectible trade secrets.

Prior to the enactment of the Uniform Trade Secrets Act in 1984 (Civ. Code, § 3426 et seq.), California had followed the broad approach of the Restatement of Torts in defining a trade secret. " 'A trade secret may consist

---

[14]Van Den Berg successfully pursued that remedy in this action and received a damage award for the wrongful termination of his employment.

of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " *(Ungar Electric Tools, Inc.* v. *Sid Ungar Co., Inc.* (1961) 192 Cal.App.2d 398, 403 [13 Cal.Rptr. 268] (quoting from Rest. Torts, § 757, com. b, p. 5), disapproved on another point in *Nichols* v. *Hast* (1965) 62 Cal.2d 598, 601 [43 Cal.Rptr. 641, 400 P.2d 753].) By its adoption of the Uniform Trade Secrets Act, California effectively adopted the common law definition. Civil Code section 3426.1, subdivision (d), provides: " 'Trade Secret' means information, including a formula, pattern, compilation, program, device, method, technique or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

█ Such definitions necessarily compel the conclusion that a trade secret is protectible only so long as it is kept secret by the party creating it. *(Ungar Electric Tools, Inc.* v. *Sid Ungar Co., Inc., supra,* 192 Cal.App.2d at p. 403.) If a so-called trade secret is fully disclosed by the products produced by use of the secret then the right to protection is lost. *(Futurecraft Corp.* v. *Clary Corp.* (1962) 205 Cal.App.2d 279, 289 [23 Cal.Rptr. 198].)

█ Defendants rely on this latter point to defeat plaintiffs' claim. They contend that the products produced by Vacco fully disclosed the "trade secrets" used to produce them. This was a disputed factual issue at trial as to which both parties introduced evidence. In finding for the plaintiffs, the jury necessarily resolved this issue in plaintiffs' favor and we will not revisit it here. It is sufficient to note that there was substantial evidence to support the conclusion that Vacco's plans and designs for its products were trade secrets at both common law and under the Uniform Trade Secrets Act. It is also clear that Vacco treated them as secrets and took reasonable steps to protect them.

Defendants, and specifically Van Den Berg, obtained these secrets improperly. Their tortious acts resulted from a breach of confidence by Van Den Berg in copying or stealing plans, designs and other documents related to Vacco's products which defendants themselves wanted to produce in competition with Vacco. The protection which is extended to trade secrets fundamentally rests upon the theory that they are improperly acquired by a defendant, usually through theft or a breach of confidence.[15] (See generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, §§ 103-105, pp. 784-787.)

---

[15]Under the Uniform Trade Secrets Act, the terms "improper means" and "misappropriation" are expressly defined. Civil Code section 3426.1 provides in pertinent part: "(a)

██ ██ ▬ ██ ██ We have no trouble whatever concluding that the defendants misappropriated protectible trade secrets belonging to Vacco,[16] whether common law or statutory standards are applied.[17] As the evidence reflects that defendants' acts of misappropriation occurred both before and after the effective date of the Uniform Trade Secrets Act (January 1, 1985), both standards are respectively applied.[18] With respect to the post-January 1, 1985, conduct of the defendants, we emphasize that the term "misappropriation" is defined to include the "use of a trade secret." (Civ. Code, § 3426.1, subd. (b)(2).)[19]

### 3. Defendants Can Not Avoid Liability by Virtue of Vacco's Wrongful Termination of Van Den Berg

██ We have already discussed our conclusion that Vacco's wrongful termination of Van Den Berg did not excuse his obligation to comply with the terms of the noncompetition agreement. Similarly, and for the same

---

'Improper means' includes theft, bribery, misrepresentation, breach of inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means. [¶] (b) 'Misappropriation' means: [¶] (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [¶] (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: [¶] (A) Used improper means to acquire knowledge of the trade secret; or [¶] (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: [¶] (i) Derived from or through a person who had utilized improper means to acquire it; [¶] (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [¶] (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or [¶] (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

[16]Defendants complain that plaintiffs failed to properly identify the trade secrets which they sought to protect as required by Code of Civil Procedure section 2019, subdivision (d), prior to commencing discovery. The record reflects that plaintiffs did file a notice identifying trade secrets for which they sought protection. After discovery commenced, this notice was amended several times. We find no error in this procedure and the trial court did not abuse its discretion in denying defendants' motion *in limine* which sought to limit plaintiffs to the trade secrets described in their original notice.

[17]Although no conflict exists in this case, we note that if there were any, the provisions of the Uniform Trade Secrets Act would control. (*American Credit Indemnity Co.* v. *Sacks* (1989) 213 Cal.App.3d 622, 630 [262 Cal.Rptr. 92].)

[18]Civil Code section 3426.10 provides: "This title does not apply to misappropriation occurring prior to January 1, 1985. If a continuing misappropriation otherwise covered by this title began before January 1, 1985, this title does not apply to the part of the misappropriation occurring before that date. This title does apply to the part of the misappropriation occurring on or after that date unless the appropriation was not a misappropriation under the law in effect before the operative date of this title."

[19]As the trial court put it, ". . . since defendants used the trade secret [*sic*] of plaintiffs after 1/1/85, the Uniform Trade Secrets Act (CC 3426-3426.10) is applicable to this case. See CC 3426.10."

essential reason, we conclude that Vacco's wrongful act can not justify Van Den Berg's tortious invasion of Vacco's common law and statutory right to protect its trade secrets.

However, defendants add another layer to this argument. They contend that Vacco's conduct was such as to bar its claim for compensatory and injunctive relief under the doctrine of "unclean hands." ▉ It is settled law that one who seeks equity must do equity. This is a principle which has application in a legal action as well as one in equity (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728 [39 Cal.Rptr. 64]) and it is more than a mere banality. "It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." (*Precision Co.* v. *Automotive Co.* (1945) 324 U.S. 806, 814, [89 L.Ed. 1381, 1386, 65 S.Ct. 993].)

This rule is, however, not without an important exception. It does not call for denial of relief for just *any* past improper conduct. "The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* 227 Cal.App.2d at p. 728; see also *Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1742-1743 [286 Cal.Rptr. 435]; *California Satellite Systems, Inc.* v. *Nichols* (1985) 170 Cal.App.3d 56, 70 [216 Cal.Rptr. 180].) For example, in *Germo Mfg. Co.* v. *McClellan* (1930) 107 Cal.App. 532 [290 P. 534] [a case involving a suit to enjoin former employees from using trade secrets where it was claimed that plaintiff had engaged in unfair practices with others], the court rejected as immaterial the application of the doctrine, saying "to constitute such a defense the inequitable conduct charged must pertain to the very subject matter involved in the action before the court and must affect the equitable relations between the parties litigant; otherwise it is wholly irrelevant and has no place in the trial." (*Id.* at p. 541.)

While in *Germo* the inequitable conduct was directed at third parties, it does not follow that the rationale of the decision must be so narrowly applied. It can also support rejection of an "unclean hands" defense where the questioned conduct involved only the other party to the action. The critical issues are (1) the nature of the conduct, not the party at whom it is directed, and (2) the impact that such conduct has on the *equitable relations* between the parties.

 The wrongful termination of Van Den Berg's employment can not justify application of the "unclean hands" doctrine anymore than it can excuse Van Den Berg's breach of the noncompetition agreement. Plaintiffs obtained compensatory and injunctive relief arising from defendants' tortious misappropriation of trade secrets and Van Den Berg's breach of his agreement. Vacco's misconduct in terminating Van Den Berg's employment for a pretextual reason does not implicate the equities between the parties arising out of the wilful and malicious tortious misconduct alleged in plaintiffs' complaint and found by the jury to be true. The termination of Van Den Berg implicated only his contract for a term of employment and had nothing to do with his obligation, and that of Kamer and Eastlack, to refrain from a tortious invasion of the proprietary rights of Vacco and Emerson. If the conclusion were otherwise, every terminated employee could justify and defend charges of theft and misappropriation of his former employer's proprietary interests by establishing breach or wrongful termination of an express or implied employment contract. Indeed, under defendants' argument the disgruntled employee's joint tortfeasors would also be allowed the benefit of such defense. Such a result finds no support in law or common sense.

 ██ ██ We therefore conclude that plaintiffs are not barred from recovering compensatory and injunctive relief for (1) the misappropriation of their trade secrets and (2) Van Den Berg's breach of his noncompetition agreement, because of Vacco's wrongful pretextual termination of Van Den Berg.[20] We emphasize that to hold otherwise would be to encourage unfair competition and theft of trade secrets by every discharged employee who felt wronged by an employer's act.

The injunctive relief which was obtained by plaintiffs is authorized by Civil Code section 3426.2.[21] The jury expressly found that defendants had misappropriated plaintiffs' trade secrets and had done so with

---

[20]Van Den Berg and Eastlack argue that whatever the liability of Kamer, they can have no liability as individuals for the misappropriation of plaintiffs' trade secrets. They claim that they simply acted as the officers of their corporate principal. However, this argument confuses the concept of alter ego, which imposes liability of a sham corporation on its controlling or managing shareholders, with the principle which is applicable here. Van Den Berg and Eastlack, as employees and agents of Kamer, are jointly liable for torts committed in the corporate name. (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, pp. 144-145.) Thus, even assuming that they acted only as agents, they would still have individual liability; and, of course, Van Den Berg has personal liability for his breach of the noncompetition agreement.

[21]Civil Code section 3426.2 provides: "(a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the

malice. The court's act of enjoining defendants' further use and enjoyment of Vacco's trade secrets was entirely appropriate. Given our conclusion as to the enforceability of Van Den Berg's noncompetition agreement and the substantial evidence of his violation thereof, the court also properly restrained his further breach of that covenant. (*Monogram Industries, Inc.* v. *Sar Industries, Inc., supra,* 64 Cal.App.3d at p. 703.)

### 4. *The Award of Attorney Fees Was Proper Under the Uniform Trade Secrets Act But Improper Under the Third Party Tortfeasor Doctrine*

Following the conclusion of the trial, the court, upon application of the plaintiffs, awarded them $526,360 in attorney fees. This was apportioned by the court so that $175,453.33, or one-third of the total fees claimed, was awarded under Civil Code section 3426.4 and imposed jointly against all three defendants. An additional sum of $350,906.67 was imposed against Van Den Berg alone under the third party tortfeasor doctrine. (*Prentice* v. *North Amer. Title Guar. Corp., supra,* 59 Cal.2d 618.)

The record reflects that defendants made no specific objection as to this apportionment of the fees by the trial court. ██ However, they do raise a strong objection here as to the legal authority for the imposition of either award. Clearly, defendants did not consent to the award by the trial court, but vigorously opposed it on both procedural and substantive grounds. Plaintiffs' contention that defendants have waived their right to object to the fee awards is without merit.

In order to justify fees under Civil Code section 3426.4,[22] the court must find that a "willful and malicious misappropriation" occurred. That requirement is satisfied, in our view, by the jury's determination, upon clear and convincing evidence, that defendants' acts of misappropriation were done with malice. This finding was necessary to the award of punitive damages which was made by the jury. However, it is also sufficient to justify the statutory portion of the fee award. This also disposes of defendants' argument that there was no statutory basis for the award.

Defendants now argue on appeal that the issue of attorney fees, including the amount thereof, was never submitted to the jury for its determination.

---

misappropriation. [¶] (b) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited. [¶] (c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

[22] Civil Code section 3426.4 provides in pertinent part: "If a . . . willful and malicious misappropriation exists, the court may award reasonable attorneys fees to the prevailing party."

With respect to the award made under section 3426.4, this argument over-looks the provisions of Code of Civil Procedure section 1033.5, subdivision (a)(10), which provides that allowable costs under Code of Civil Procedure section 1032 include attorney fees whenever they are authorized by contract *or statute*. Such authorized fees are properly fixed by the court in a posttrial noticed motion. (Code Civ. Proc., § 1033.5, subd. (c)(5).)[23]

Our review of this extensive record, including a clerk's transcript of over 4,000 pages and a trial transcript of nearly 1,200 pages demonstrates no abuse of discretion on the part of the trial court in making this award. That the compensatory damages from defendants' willful and malicious misappro-priation were not substantial may only reflect that they had not yet been successful in financially injuring the plaintiffs and that the injunctive relief, interposed to prevent such harm, was the most significant relief which the plaintiffs sought or obtained. The trial court had this case for a substantial portion of the pretrial proceedings as well as the trial. It was in the best position to determine the proper amount to award.[24]

■ While the provisions of Civil Code section 3426.10 (see fn. 18, *ante*) clearly require an allocation of attorney fees so that no fees are awarded relative to any misappropriation which occurred prior to January 1, 1985, nothing further was required of the trial court here in order to validate this award. First, there *was* an allocation of the total fees made in the plaintiffs' application of their total requested fees. They only claimed that one-third were attributable to defendants' post-January 1, 1985, conduct. The trial court in making the requested award impliedly found such allocation to be reasonable. Such implied finding is supported by substantial evidence of defendants' continuing *use* of plaintiffs' trade secrets after January 1, 1985. Secondly, the defendants made no objection to this allocation in the trial

---

[23]Such an award, of course, requires that plaintiffs be properly determined to be the "prevailing parties," but we have no trouble concluding that plaintiffs were the prevailing parties at trial and thus legally entitled to recover their costs. While the monetary awards were a near offset, plaintiffs did receive a net monetary recovery, albeit slight. More significantly, they received a substantial nonmonetary victory. Code of Civil Procedure section 1032, subdivision (a)(4), defines prevailing party as follows: " 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. *When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court*, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034." (Italics added.)

[24]The evidence offered by plaintiffs, and which was not contradicted by the defendants, demonstrated that a total fee award of $526,000 was reasonable. For a general discussion of the factors which courts may consider in making such an award, see *Fed-Mart Corp.* v. *Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 225-226 [168 Cal.Rptr. 525].

court. Not having raised an objection there, they may not do so here for the first time. )

 However, with respect to the award made against Van Den Berg under the *Prentice* case, we reach an entirely different result. That award appears to be improper both procedurally and substantively. First, the award of attorney fees under the third party tortfeasor doctrine necessarily involves a damage issue which should have been submitted to the jury. (*Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 819 [210 Cal.Rptr. 211, 693 P.2d 796].) ██ ██ In *Brandt*, the Supreme Court noted that "[where] the attorney's fees are recoverable as damages, the determination of the recoverable fees must be made by the trier of fact unless the parties stipulate otherwise. [Citation.]" (*Brandt*, 37 Cal.3d at p. 819.)[25] The trial court treated the award of *Prentice* fees here as though they were costs. This is appropriate where the award of fees is authorized by either contract or statute (Code Civ. Proc., § 1033.5, subd. (a)(10)), but not where the fees are claimed as part of the damages flowing from a tortfeasor's misconduct.

Secondly, the award is also substantively incorrect. Therefore, this is not a matter which can be resolved by returning it to the trial court for application of the proper procedure. In *Prentice* v. *North Amer. Title Guar. Corp.*, *supra*, 59 Cal.2d 618, a paid escrow holder had made it necessary for a vendor of land to file a quiet title action against a third person. The court found that the attorney fees incurred by the vendor in prosecuting that action were part of the damages sustained by the vendor and were recoverable in the negligence action against the escrow holder. The court held that this circumstance created an exception to the rule of Code of Civil Procedure section 1021.[26] That section "undoubtedly prohibits the allowance of attorney fees against a defendant in an ordinary two-party lawsuit. [Citations.] . . . [¶] [However,] [t]he section is not applicable to cases where a defendant has wrongfully made it necessary for a plaintiff to sue a third person. [Citations.] In this case we are not dealing with 'the measure and mode of compensation of attorneys' but with damages wrongfully caused by defendant's improper actions." (*Prentice*, *supra*, 59 Cal.2d at pp. 620-621.)

This rationale has been used, for example, to award fees (1) against a broker in favor of a prospective purchaser of real estate who had been

---

[25]There was, of course, no stipulation here which would have permitted the trial judge to make this factual determination. We reject out of hand the plaintiffs' argument that the defendants' failure to object to the allocation of one-third of the total fees to the post-January 1, 1985, statutory award constituted a consent to the making of an award under *Prentice*.

[26]Code of Civil Procedure section 1021 provides in pertinent part: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement . . . of the parties."

induced to file an action for specific performance against the sellers by the fraudulent misrepresentations made by the broker (*Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505-507 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763]) and (2) against an insurance company for its bad faith failure to pay benefits due under a policy of disability insurance (*Brandt* v. *Superior Court, supra,* 37 Cal.3d 813, 817.)

The pleadings and the evidence demonstrated that Van Den Berg and Eastlack, working together with their newly acquired corporate vehicle, Kamer, jointly committed the tortious acts of which Vacco complained. There is nothing about their relationship or their conduct that justifies singling out Van Den Berg as the one whose conduct caused Vacco to have to prosecute a legal action against the other two. Yet, this is the justification which Vacco offers for the imposition of *Prentice* fees against Van Den Berg. The rule of *Prentice* was not intended to apply to one of several joint tortfeasors in order to justify additional attorney fee damages. If that were the rule there is no reason why it could not be applied in every multiple tortfeasor case with the plaintiff simply choosing the one with the deepest pocket as the "*Prentice* target." Such a result would be a total emasculation of Code of Civil Procedure section 1021 in tort cases.

As *Prentice* originally emphasized, there is no basis for awarding attorney fees to a successful party in what is essentially a "two-party" lawsuit. That is precisely what is presented here. Van Den Berg and his two codefendants jointly engaged in tortious misconduct for which they were sued by plaintiffs. There is no justification for the application of the third party tortfeasor doctrine as a basis for awarding attorney fees to plaintiffs. Thus, quite apart from the procedural infirmity, this is not a proper case for an award of fees as damages.

## CONCLUSION

For all of the foregoing reasons, we conclude that the judgment of the trial court determining the respective compensatory and punitive damages to be awarded to the parties under the complaint and cross-complaint, as well as the injunctive relief and posttrial award of attorney fees in the sum of $175,453.33 jointly against the defendants was proper. However, the non-statutory award of attorney fees against Van Den Berg ($350,906.67) was without a legal basis and cannot stand.

## DISPOSITION

The award of attorney fees against Van Den Berg in the sum of $350,906.67 is stricken. Except as so modified, the judgment is affirmed. Each of the parties shall bear their own costs on appeal.

Klein, P. J., and Hinz, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 25, 1992.