Filed 2/19/15  Raicevic v. Lopez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VLADIMIR RAICEVIC, Individually and as Trustee, etc., et al.,<br><br>        Plaintiffs and Respondents,<br><br>    v.<br><br>STEPHEN F. LOPEZ et al.,<br><br>        Defendants and Appellants. | D061253<br><br>(Super. Ct. No. GIC881930)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 23, 2015, be modified as

follows:

The first full paragraph on page 21 (beginning with "Defendants' claim of evidentiary error") and the following paragraph that starts on page 21 (beginning with "In any event") and continues onto page 22 are deleted and replaced with the following paragraph:

> Defendants' claim of evidentiary error is premised on their assertions that Thompson "only testified that *a single statement* made in the transmittal letter authored by Lopez . . . constituted an actionable misrepresentation", and "[t]he balance of his testimony focused . . . on critiquing the manner in which Lopez had drafted the

pledge agreement, testimony that went directly to whether Lopez had breached a malpractice standard of care."  However, the record does not support these assertions.  A review of the reporter's transcript of Thompson's testimony shows, as Plaintiffs correctly point out, that Thompson provided no testimony on either direct examination or cross-examination as to whether any representation by Lopez was "actionable."

There is no change in the judgment.

Respondents' petition for rehearing is denied.

BENKE, Acting P. J.

2

Filed 1/23/15 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VLADIMIR RAICEVIC, Individually and as Trustee, etc., et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> STEPHEN F. LOPEZ et al., <br><br> Defendants and Appellants. | D061253 <br><br><br> (Super. Ct. No. GIC881930) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed in part; reversed in part.

Boudreau Williams, Jon R. Williams; Law Office of Edward J. Babbitt, Edward J. Babbitt; Geraci & Lopez and Alan L. Geraci for Defendants and Appellants.

Law Offices of Jerry D. Cluff and Jerry D. Cluff for Plaintiff and Respondent Vladimir Raicevic.

Harris & Collins and Charles B. Harris for Plaintiff and Respondent Imelda Raicevic.

INTRODUCTION

This fraud case returns to this court following a 2011 jury trial on remand after the reversal of a summary judgment entered in favor of defendants Stephen F. Lopez (an attorney) and the law firm of Geraci & Lopez (together Defendants) in a prior appeal (*Andjelka Raicevic, Individually and as Trustee, etc. et al. v. Stephen F. Lopez et al.* (Aug. 18, 2010, D055002) [nonpub. opn.]).  This case involves two secured loan transactions that ended in default, and Defendants' alleged use of various alleged written misrepresentations and concealments of material fact to persuade the lenders—former plaintiff Andjelka Raicevic[1] and her former husband Vojo Raicevic[2] (both of whom are now deceased)—to (1) remove the deed of trust that secured the loan repayment obligations of the borrowers—Defendants' clients Hardy Matthew Travis (Matthew Travis) and his then-wife Launi Kay Travis (Launi Travis) (together the Travises), who

---

[1]    In January 2013 Vladimir Raicevic was substituted in as a plaintiff in this case in the place of his mother, former plaintiff Andjelka Raicevic, who died in 2012.

[2]    Andjelka Raicevic and Vojo Raicevic divorced in 1991.  Vojo Raicevic's second wife, Imelda Raicevic, married him in 1997.  Vojo Raicevic died in July 2005.
       The operative first amended complaint (the complaint or amended complaint) names two plaintiffs in this action:  Andjelka Raicevic and Imelda Raicevic.  Specifically, it names "ANDJELKA RAICEVIC individually and as Trustee of the ANDJELKA BOJIC RAICEVIC 1991 TRUST, and IMELDA RAICEVIC on behalf of Vojo Raicevic, individually as Executrix of the Estate of Vojo Raicevic, deceased, and as Successor Trustee of the VOJO RAICEVIC 1991 REVOCABLE TRUST."
       As Andjelka Raicevic, Vojo Raicevic, Vladimir Raicevic, and Imelda Raicevic all share the same last name, in the interest of clarity we occasionally refer to them by their first names.  We intend no disrespect.

also were defendants in this case but are not parties to this appeal[3]—and (2) replace that deed of trust with an illusory pledge of unspecified personal property supposedly in the possession of the Travises.

Defendants' alleged written misrepresentations (discussed, *post*) were set forth in a May 2004 letter (the May 2004 transmittal letter or transmittal letter) that Lopez prepared on behalf of the Travises and sent to Andjelka and Vojo along with the proposed pledge agreement. As pertinent here, the plaintiffs (Andjelka and Imelda) asserted causes of action for intentional and negligent misrepresentation. The jury returned special verdicts against Defendants and in favor of the plaintiffs on those two causes of action and awarded compensatory damages in the total amount of $588,000.

In this appeal from the resulting judgment, Defendants challenge the jury's verdicts in favor of Andjelka and Imelda on their causes of action for intentional and negligent misrepresentation, and they also challenge the award of attorney fees to Andjelka and Imelda. Defendants raise five principal contentions.

First, asserting that "[t]his [was] not a malpractice action" when it was tried on remand, Defendants contend that the plaintiffs impermissibly "tried their case as a professional negligence action, offering expert witness testimony (over [Defendants'] repeated objections) about the duties of care Lopez, as an attorney, owed to [Andjelka

---

[3]     Matthew Travis, who was named as a defendant in the original complaint in this matter, died in 2007 before he answered that complaint. The amended complaint names, as a defendant, E. David Wininger "as personal representative of the estate of HARDY MATTHEW TRAVIS, and as Successor Trustee of the HARDY MATTHEW TRAVIS TRUST dated March 29, 2005."

and Vojo] in both drafting that pledge agreement and in presenting it to [them]."  In support of this contention, Defendants assert that the only duty they owed in drafting the pledge agreement was to their clients, the Travises, and that the court abused its discretion in admitting expert testimony by one of Andjelka and Imelda's expert witnesses that "went directly to whether Lopez had breached a malpractice standard of care."

Second, Defendants contend that "[t]he fraud judgment entered against [them] must fail as it was based on non-actionable opinions, and not statements of fact, on which there was no[] proof of reliance."  In support of this contention, Defendants claim that (1) the evidence is insufficient to establish an exception to the general rule that statements of opinion or predictions of future conduct are not actionable, and (2) the evidence is insufficient to support the jury's findings that Andjelka and Vojo reasonably relied on representations Defendants made in the May 2004 transmittal letter.

Third, Defendants contend the plaintiffs "failed to prove an essential element of their [fraud] claim (damages) based upon the value of the real property security interest they claimed to have lost as a result of [Defendants'] conduct" because the court "allowed [an] incorrect measure of damages to be used as to the value of the Travises' property."  In support of this contention, Defendants complain that the deed of trust on the Travises' Paseo Valle Alto property, which had secured the loans Andjelka and Vojo made to the Travises, was reconveyed in June 2004 when Andjelka and Vojo signed the pledge agreement, but the plaintiffs' valuation expert "was not an appraiser" and he valued the

4

loss of the security interest in that property not as of June 2004, but as of November 10, 2004—five months later—when the Travises' sale of that property closed.

Fourth, Defendants contend the court erred in denying their posttrial offset motion in which they sought (pursuant to Code of Civil Procedure section 877) "credits for the settlements [the plaintiffs] previously reached both with Launi Travis and with the Estate of [Matthew] Travis." In support of this contention, Defendants assert that, "as the damage[s] [the plaintiffs] sought from [them] and the Travises at trial was the value of the security [the plaintiffs] claimed they lost after executing the pledge agreement (approximately $588,000)," Defendants "were entitled to offset the entire amount in light of the higher amount of proceeds [the plaintiffs] had already recovered from the Travises [($965,444)] prior to trial."

Last, Defendants contend the court "erred as a matter of law by awarding [the current plaintiffs] their attorney[] fees" under the tort of another doctrine.

For reasons we shall explain, we strike the award of attorney fees the court granted in favor of the current plaintiffs. In all other respects we affirm the judgment.[4]

---

[4] We grant current plaintiffs' unopposed July 14, 2014 request for judicial notice of 10 specified records of the United States Bankruptcy Court, Southern District of California, copies of which are included in volume No. 2 of current plaintiffs' respondents' appendix in lieu of clerk's transcript.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Factual Background*

1.  *Parties*

The two current plaintiffs in this case (hereafter Plaintiffs) are Vladimir Raicevic—the son of Vojo Raicevic and Vojo's first wife, Andjelka Raicevic—who is the successor trustee of the Andjelka Bojic Raicevic 1991 Trust and Imelda Raicevic, who is Vojo's widow, the executor of his estate, and the successor trustee of the Vojo Raicevic 1991 Revocable Trust.

Andjelka and Vojo, who left former Yugoslavia where they were born and later emigrated to the United States in 1962, married and eventually divorced in 1991.  Vojo married Imelda in 1997 and died in mid-2005.  Andjelka, who had difficulty speaking English after she suffered a stroke in 2003, died in 2012.

Vojo was born in April 1922 and was 82 years of age in May 2004 when Lopez prepared the transmittal letter and pledge agreement that are at issue in this case.  Andjelka was born in March 1938 and was 66 years of age in May 2004.

2.  *Brief summary of the underlying transactions*[5]

a.  *The two subject loans and promissory notes*

In 1998 Andjelka and Vojo sold real property (Poway Road) to the Travises through Matthew Travis as trustee of their family trust and took back a $1.45 million

---

[5]    The following factual summary of the underlying transactions is derived in part from this court's unpublished opinion in the prior appeal (D055002) based on the undisputed material facts presented by the parties during the summary judgment proceedings.

promissory note (the 1998 note) secured by that real property. The Travises' residence (Paseo Valle Alto) was later substituted in the place of the original real property as security for repayment of the loan.

In 2003 Vojo loaned Matthew Travis an additional $100,000 and took back a second promissory note (the 2003 note) that was also secured by a trust deed on the Paseo Valle Alto property.

In April 2004 the Travises notified Andjelka and Vojo that they could not keep the payments current on the two notes because of cash flow problems associated with their corporation, and they requested a deferment of the monthly payments on the notes, but Andjelka and Vojo refused the request.

b. *The May 2004 pledge agreement and Defendants' transmittal letter*

The Travises brought Defendants into the transaction to seek a substitution of security on the notes. Defendants drafted a pledge agreement to substitute "all personal property assets of debtors" as collateral for the release of the real property security. Under the proposed pledge agreement, the Travises would covenant to create and protect a security interest and to "[e]xecute all documents necessary to allow Secured Part[ies] [(Andjelka and Vojo)] to record a UCC-1 financing statement or other documents necessary to give notice of and or perfect" the security interest. The proposed pledge agreement, which also defined events of default and the remedies on default, was sent by Defendants to Andjelka and Vojo along with the May 27, 2004 transmittal letter.

In the May 2004 transmittal letter, which was addressed to Andjelka and Vojo on Geraci & Lopez letterhead and signed by Lopez, Defendants first stated that the Travises

7

had asked them to "submit the following proposal" regarding the 1998 note and deed of trust, and explained the proposed agreement as follows. On behalf of the Travis family trust, Defendants requested that Andjelka and Vojo "remove [their] deed of trust" from "the Travis[es'] property" (Paseo Valle Alto), and "allow the [Travis family] trust to sell that property free and clear of [their] lien." Defendants then stated that, "[i]n exchange," the Travises "will do as follows." The following six statements followed: (1) The Travises will "[c]ontinue to keep your note current"; (2) the Travises will "[p]ersonally guarantee the note"; (3) the Travises will "[p]ledge all of their personal assets to you pursuant to the enclosed pledge agreement"; (4) the Travises will "obtain[] permanent financing" on the Travises' corporation, Poway City Centre, and Andjelka and Vojo then "will have the option of either continuing the payments or being paid off fully on the note"; (5) taking those actions "will allow the Travises to keep you current on your note"; and (6) "[i]f this [is] acceptable, please call [Matthew Travis] or myself [(Lopez)] so that the necessary paper work can be finalized."

Without consulting their own counsel, Andjelka and Vojo signed the pledge agreement on June 15, 2004. The pledge agreement was drafted in such a way that no UCC-1 statement had to be recorded until all the notes were already in default, which essentially defeated the purpose of any UCC-1 document. Defendants never prepared or recorded any UCC-1 lien that would have provided any public notice of Andjelka and Vojo's security interest in any of the Travises' personal assets.

In mid-June 2004, in reliance on the representations in Defendants' May 2004 transmittal letter, Andjelka and Vojo reconveyed their real property security interest. But

8

for that reconveyance, Andjelka and Vojo would have received $588,000 from the proceeds of the Travises' sale of their home in November 2004.

Around that same time, the Travises separated and began to split up their millions of dollars worth of assets, including the corporation and the proceeds of the sale of the Paseo Valle Alto property (which they sold in November 2004). After August 2004, the Travises stopped making regular payments to Andjelka and Vojo, then paid the arrears in April 2005, and made only a partial payment in February 2006. They then stopped paying Andjelka and Vojo altogether.

### B. *Procedural Background*[6]

#### 1. *Complaint*

In March 2007 Andjelka and Imelda brought this action for damages and injunctive relief against Defendants and the Travises. Matthew Travis died in May 2007 before he answered the complaint, and his estate's administrator was substituted as a party.

As pertinent here, the complaint alleged a cause of action against Defendants for breach of professional duty and three causes of action against both the Travises and Defendants: (1) financial abuse of elderly persons, (2) intentional misrepresentation, and (3) negligent misrepresentation.

This court explained in the opinion filed in the previous appeal that:

> "[Andjelka and Vojo] allege[d] that Defendants were aware that the
> pledge agreement was substantially inferior as a security device for

---

[6]     Additional details about the procedural history of this case shall be discussed, *post*.

9

repayment of the notes, so that the substitution of the ineffective pledge agreement amounted . . . to bad faith taking of the personal property of [Andjelka] and [Vojo], who were 65 and 82 at the time. Also, [Andjelka] had recently had a stroke (October 2003). [Andjelka and Vojo] sought damages for financial loss and also emotional distress damages, for their fears of being left homeless for lack of funds, among other things.

"In their . . . cause of action for breach of professional duty, [Andjelka and Vojo] allege[d] that when the Travises retained Defendants to prepare an effective pledge agreement, Defendants' professional duties also extended toward [them], as intended third party beneficiaries of the attorney retention contract.  [Andjelka and Vojo] plead[ed] numerous factors to support their allegations of duties owed to them, in the style recognized in leading case law. (See, e.g., *Lucas v. Hamm* (1961) 56 Cal.2d 583 (*Lucas*) [attorney liable to beneficiaries under a will].)  [Andjelka and Vojo sought] financial damages due to negligence of Defendants, including attorney fees incurred to prosecute the case.

"Further, in the causes of action for intentional misrepresentation and negligent misrepresentation, [Andjelka and Vojo] claim[ed] they suffered damages due to their reasonable reliance on representations made by Defendants about the nature and effect of the pledge agreement, in the transmittal letter.  Facts [were] pleaded about these Defendants' roles in preparing and communicating the proposal for the pledge agreement, along with their later cooperation in the Travises' obtaining of alternative financing for the corporation by using its shares (already pledged as collateral to [Andjelka and Vojo]) as security for a 2005 corporate refinancing deal.  [Andjelka and Vojo] therefore contend[ed] Defendants negligently represented, without reasonable basis, that the pledge agreement would be effective throughout the process of obtaining alternative financing for the corporation, or they concealed that it would not.  Such negligent representation, concealment and failure to disclose the true intentions of all the Defendants was allegedly material to [Andjelka's and Vojo's] decisions to proceed with the pledge agreement.  Similar allegations [were] made about Defendants' intentional misleading of [Andjelka and Vojo].  Financial and emotional distress damages were sought."

### 2. *Launi Travis's July 2009 stipulation to entry of judgment*

In early July 2009, Launi Travis stipulated to entry of a money judgment on the complaint in the amount of $1.5 million, and the trial court ordered entry of that judgment. Launi Travis thereafter filed a chapter 7 bankruptcy petition and was discharged in July 2010.

### 3. *July 2009 settlement agreement between Plaintiffs and Matthew Travis's estate*

In late July 2009, Plaintiffs settled their claims against Matthew Travis's estate, and the court granted the unopposed motion brought by the administrator of Matthew Travis's estate under Code of Civil Procedure section 877.6 for a determination that the settlement was made in good faith.

### 4. *Defendants' summary judgment motion*

Defendants filed a motion for summary judgment or, in the alternative, summary adjudication. In February 2009 the court granted summary judgment in favor of Defendants.

### 5. *Prior appeal and this court's reversal of the grant of summary judgment in favor of Defendants*

Imelda and her then-coplaintiff Andjelka appealed the grant of summary judgment in favor of Defendants, and this court reversed the summary judgment. In the unpublished opinion filed in August 2010 (D055002), this court stated that, "with respect to the cause of action for legal malpractice, the trial court correctly determined as a matter of law that Defendants did not undertake or owe to Plaintiffs the professional duties of an attorney in the pledge agreement transaction, since at all times, Plaintiffs

11

were adverse in interest to the attorney Defendants' representation of the Travis Defendants and in the pledge agreement, and Plaintiffs did not qualify as third party or intended beneficiaries of its terms, as a matter of law."[7]

However, this court then stated that the court "erred in concluding that Defendants were entitled to summary judgment as a matter of law on all of the claims brought against them. On this record, Plaintiffs carried their burden of showing that triable issues of material fact remain as to negligent misrepresentation of facts, or the existence of enforceable duties to disclose all relevant facts even to adverse parties in the transaction, in light of the expressly disclosed purpose of the Defendant attorneys' retention. [Citation.] Triable issues also remain on whether reliance on the representations by Plaintiffs was justified."

This court also stated that, "[r]egarding the claim for intentional misrepresentation, the trial court erred in declaring that none of Defendants' alleged misrepresentations in the transmittal letter could be deemed actionable, on the ground given (that statements of opinion relating to future actions of third parties, such as the Travises, are not actionable). [Citation.] Even regarding this arm's-length transaction, Plaintiffs have brought forth sufficient evidence on whether these attorney Defendants acted contrary to the same duty others have "'not to defraud another, even if that other is an attorney negotiating at arm's length."' (*Vega* [*v. Jones, Day, Reavis & Pogue* (2004)] 121 Cal.App.4th 282, 291.)"

---

7       Plaintiffs dismissed their professional negligence cause of action after remand.

Regarding the cause of action for financial elder abuse, this court stated, "[W]e are unable to determine that no triable issues of fact were demonstrated regarding . . . whether the nature of these Defendants' involvement in the pledge agreement transaction fell within the scope of coverage of the [applicable statutes]."

6. *Jury trial on remand*

Plaintiffs dismissed their professional negligence cause of action after remand. The remaining causes of action for financial abuse of elderly persons, intentional misrepresentation, and negligent misrepresentation were tried before a jury. The jury returned special verdicts finding in favor of Defendants on the cause of action for financial abuse of elderly persons, but found in favor of the plaintiffs on the two causes of action for misrepresentation and awarding to the plaintiffs (among other things) compensatory damages in the total amount of $588,000.

DISCUSSION

I. *CLAIM THAT THE COURT ERRED IN PERMITTING THIS CASE TO BE TRIED ON REMAND AS A PROFESSIONAL NEGLIGENCE ACTION*

Asserting that "[t]his [was] not a malpractice action" when it was tried on remand, Defendants challenge the verdicts finding them liable for intentional and negligent misrepresentation by contending the plaintiffs impermissibly "tried their case as a *professional negligence action*, offering expert witness testimony (over [Defendants'] repeated objections) about the duties of care Lopez, as an attorney, owed to [Andjelka and Vojo] in both drafting that pledge agreement and in presenting it to [them]." (Italics added.) In support of this contention, Defendants assert that the only duty they owed in

13

drafting the pledge agreement was to their clients, the Travises, and that the court abused its discretion in admitting expert testimony by Peter Thompson (one of Andjelka and Imelda's expert witnesses) that "went directly to whether Lopez had *breached a malpractice standard of care*." (Italics added.) Defendants' contention is unavailing.

A. *Applicable Legal Principles*

1. *Intentional and negligent misrepresentation*

As noted, the two causes of action at issue here are Plaintiffs' cause of action for intentional misrepresentation and their cause of action for negligent misrepresentation.

a. *Intentional misrepresentation* (*fraud*)

The elements of fraud are (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of its falsity (referred to as "scienter"); (3) intent to induce another's reliance on the misrepresentation (also referred to as intent to defraud); (4) justifiable reliance; and (5) resulting damage. (*Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173; *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

Subject to certain judicially recognized exceptions (discussed, *post*), actionable misrepresentation "must be one of existing fact." (*Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 946 (*Cohen*).)

"Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." (*Alliance Mortgage Co.*

14

*v. Rothwell*, *supra*, 10 Cal.4th at p. 1239.) "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is justified is a question of fact.'" (*Ibid*.)

b. *Negligent misrepresentation*

In contrast to fraud, "[t]he tort of negligent misrepresentation does not require scienter or intent to defraud[, and it] encompasses '[(1)] [t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true,' [and (2)] [t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though [he or she] believes it to be true.'" (*Small v. Fritz Companies, Inc.*, *supra*, 30 Cal.4th at pp. 173-174.) The elements of negligent misrepresentation are "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243.)

c. *Fraud claims against lawyers*

"A fraud claim against a lawyer is no different from a fraud claim against anyone else." (*Vega v. Jones, Day, Reavis & Pogue, supra,* 121 Cal.App.4th at p. 291.) ""If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability."' [Citation.] While an attorney's professional duty of care generally extends only to his [or her] own client and [the] intended beneficiaries of his [or her] legal work, the limitations on liability for

15

negligence do not apply to liability for fraud. [Citation.] Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient [citation], and may be liable to a nonclient for fraudulent statements made during business negotiations." (*Ibid.*, citing *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 202 ["the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length"].)

2. *Standard of review*

A trial court has "wide discretion" to exclude or admit expert testimony. (*People v. McWhorter* (2009) 47 Cal.4th 318, 362.)

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

A defendant seeking reversal of a judgment based on a claim of evidentiary error under California law has the burden of establishing not only an abuse of the trial court's discretion, but also prejudice that amounts to a miscarriage of justice. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . in any cause, on the ground of . . . the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; Code Civ. Proc., § 475 ["No judgment,

16

decision, or decree shall be reversed or affected by reason of any error . . . unless it shall appear from the record that such error . . . was prejudicial . . . ."].)

Claims of evidentiary error under California law are reviewed for prejudice applying the "miscarriage of justice" or "reasonable probability" harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) that is embodied in article VI, section 13, of the California Constitution. (*People v. Cahill* (1993) 5 Cal.4th 478, 509-510.) Under the *Watson* harmless error standard, it is the appellant's burden to show it is reasonably probable he or she would have received a more favorable result at trial had the error not occurred. (*Watson*, *supra*, at p. 836 [a "'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

B. *Analysis*

1. *Defendants' contention that this case was impermissibly tried as a professional negligence action*

The record shows the professional negligence cause of action asserted against Defendants in the complaint was dismissed in April 2011 after this court in 2010 reversed the summary judgment granted in their favor and (as pertinent here) remanded the case for trial on (among other things) the causes of action for intentional misrepresentation and negligent misrepresentation. Thus, we agree with Defendants' assertion that "[t]his [was] not a malpractice action" when it was tried before a jury on remand.

17

However, we reject Defendants' contention that the plaintiffs impermissibly "tried their case as a professional negligence action" by "offering expert witness testimony (over [Defendants'] repeated objections) about the duties of care Lopez, as an attorney, owed to [Andjelka and Vojo] in both drafting that pledge agreement and in presenting it to [them]."  (Italics added.)  We first note that the record demonstrates this case was tried as a fraud and negligent misrepresentation case, *not* as a professional negligence action.  Specifically, the record shows the opening statements of the parties' counsel correctly indicated to the jury that this was a fraud case based primarily on Defendants' alleged misrepresentations in the May 2004 transmittal letter.  For example, Lopez's counsel told the jury the defense would present "evidence that in no way, shape, or form did [Lopez] ever misrepresent anything to [Andjelka and Vojo] and never dealt with [them] and was only preparing a letter and a draft pledge agreement from his client, Matthew Travis. . . . There will be further evidence, when we get to what is called justifiable reliance on all of this, that [Andjelka] relied on the pleading and advice of her husband, [Vojo], to cut this deal on June 15, 2004, and also relied on her friendship, and her trust with Matthew Travis throughout all of this.  That no reliance was made on [Lopez's] letter."

The record also shows the court instructed the jury on the law governing the plaintiffs' causes of action for intentional and negligent misrepresentation, and not on the law pertaining to the dismissed cause of action for breach of professional duty.

The record further shows the parties' closing arguments also reflected that this case was tried as an action for fraud and negligent misrepresentation, and not as an action for breach of professional duty.  For example, Andjelka's attorney argued that Andjelka was

18

entitled to recover on the theory of "an intentional misrepresentation, that [Lopez] made a statement, knew it wasn't true to [Andjelka] in that letter of May 27, and that she was harmed by it. She relied on it, and she is entitled to the damages that flow from that misrepresentation. That's the intentional misrepresentation cause of action." Andjelka's counsel then argued that "[w]e also have a theory of negligent misrepresentation." Following further argument, Andjelka's counsel concluded by stating that Lopez "assisted in a deliberate misrepresentation of fact. . . . [I]f it wasn't deliberate on his part, it certainly was a negligent misrepresentation. Did he believe it to be true? There is no reasonable basis for believing it to be true." Another example is found in Geraci & Lopez's closing argument, during which its counsel told the jury that the special verdict forms were "broken down into the three causes of action that exist against [Lopez] and our law firm. The first one is intentional misrepresentation. Second one is negligent misrepresentation. And the third one is the elder abuse statute you've heard about."

The record does not support Defendants' contention that this case was impermissibly tried as a professional negligence action.

a. *Defendants' claim that the court prejudicially erred by admitting expert testimony by Peter Thompson that Defendants breached a malpractice standard of care*

In their related claim, Defendants assert the court prejudicially erred by admitting, over their repeated objections, expert testimony by Peter Thompson "about the duties of care Lopez, as an attorney, owed to [Andjelka and Vojo] in both drafting that pledge agreement and in presenting it to [them]." In support of this claim, as noted, Defendants assert that the only duty they owed in drafting the pledge agreement was to their clients,

19

the Travises, and that the court abused its discretion in admitting testimony by Thompson that "went directly to whether Lopez had *breached a malpractice standard of care*." (Italics added.) Defendants' claim is unavailing because they have failed to meet their burden of demonstrating that the court abused its discretion and that any error prejudicially resulted in a miscarriage of justice.

Defendants assert they had brought a motion in limine to "exclude the testimony of [the plaintiffs'] purported duty of care expert, [Thompson]," because they "were concerned that Thompson would opine on an issue of law (whether Lopez and his firm owed any duty of care to [the plaintiffs], as well as an ultimate issue of fact (whether Lopez breached any such alleged duty)." Without discussing the specifics of their in limine motion or the court's actual ruling on that motion, and without quoting any of Thompson's actual trial testimony, Defendants generally assert that the court erred by allowing Thompson, "over [their] repeated objections," to (1) "critique the manner in which the proposed pledge agreement was drafted, and to criticize Lopez for not attaching other related documents to that draft pledge agreement to make it effective"; (2) "assail the proposed pledge agreement as being ineffective in several respects (*e.g.*, because it did not adequately describe what personal property was being pledged) and as a consequence, conclude it was below established standards for drafting agreements which lawyers should learn 'in first year law school'"; (3) "assert that a lawyer should insist that personal collateral, like stock certificates, should be delivered instead of endorsed, as called for in the pledge agreement"; and (4) "emphasize that the pledge

20

agreement was 'completely ineffective' to accomplish its intended purpose, given the manner in which it had been drafted by Lopez."

Defendants' claim of evidentiary error is premised on their assertions that Thompson "only testified that *a single statement* made in the transmittal letter authored by Lopez . . . constituted an actionable misrepresentation" (original italics), and "[t]he balance of his testimony focused . . . on critiquing the manner in which Lopez had drafted the pledge agreement, testimony that went directly to whether Lopez had breached a malpractice standard of care."  However, the record does not support these assertions.  As a preliminary matter, we note that the reporter's transcript of Thompson's testimony is 50 pages in length.  We also observe that, although Defendants refer to portions of Thompson's testimony in making the assertions, they do not support those references with specific citations to the reporter's transcript of Thompson's testimony, as required by rule 8.204(a)(1)(C) of the California Rules of Court.  "[I]t is counsel's duty to point out portions of the record that support the position taken on appeal[, and we are] not required to search the record on [our] own seeking error."  (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)  Furthermore, "any point raised that lacks citation may, in this court's discretion, be deemed waived."  (*Ibid*.)  We conclude Defendants have waived the points asserted by failing to comply with rule 8.204(a)(1)(C) of the California Rules of Court.

In any event, a review of the reporter's transcript of Thompson's testimony shows, as Plaintiffs correctly point out, that Thompson provided no testimony on either direct

21

examination or cross-examination as to whether any representation by Lopez was "actionable."

Furthermore, although Defendants claim the court permitted Thompson to testify in violation of the court's ruling on the Defendants' in limine motion, they fail to address, with citations to the record, the specific scope of their limine motion and the court's actual ruling on that motion. They also do not identify, with citations to the record, the specific testimony they contend was erroneously admitted in violation of the court's ruling. Thus, we conclude Defendants have failed to meet their burden of establishing that the court abused its discretion.

We also conclude that, even if Defendants had demonstrated that the court abused its discretion, they have not met their burden of showing any such error was prejudicial. Under the applicable *Watson* harmless error standard, Defendants have the burden of showing on appeal—"'after an examination of the entire cause, including the evidence'"—that it is reasonably probable they would have received a more favorable result at trial had the claimed error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Here, Defendants assert in their opening brief, in a conclusory manner, that Thompson's "*prejudicial* testimony resulted in a jury verdict and [Defendants] being held liable to third parties . . . ." (Italics added.) Defendants have failed to establish that any error by the court resulted in a miscarriage of justice within the meaning of *Watson* and article VI, section 13, of the California Constitution.

## II. *DEFENDANTS' CLAIMS THAT (1) THE JUDGMENT IS BASED ON NONACTIONABLE OPINIONS BY LOPEZ IN THE MAY 2004 TRANSMITTAL LETTER, AND (2) THE EVIDENCE IS INSUFFICIENT TO ESTABLISH THAT ANDJELKA AND VOJO REASONABLY RELIED ON REPRESENTATIONS IN THE TRANSMITTAL LETTER*

Defendants next contend "[t]he fraud judgment entered against [them] must fail as it was based on non-actionable opinions, [not on] statements of fact, on which there was no[] proof of reliance."  Specifically, the claimed "non-actionable opinion[]" to which Defendants refer is the portion of the Defendants' May 2004 transmittal letter to Andjelka and Vojo that stated:  "Upon obtaining permanent financing on Poway City Centre,[8] you will have the option of either continuing the payments or being paid off fully on the note."  Defendants' contention is unavailing.

### A. *Standard of Review*

"When a judgment is attacked as being unsupported by the evidence, 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact].'"  (*PWS, Inc. v. Ban* (1991) 234 Cal.App.3d 223, 230.)  "'[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence.  It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular

---

8    As noted, *ante*, Poway City Centre, Inc. was the Travises' corporation.

case.'"  (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204.)

Under the applicable substantial evidence standard of review, we must review the entire record and view all factual matters in the light most favorable to the prevailing party and the judgment.  (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925; *Washington v. Farlice* (1991) 1 Cal.App.4th 766, 771-772.)  We do not reweigh the evidence or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from the evidence.  (*White v. Inbound Aviation* (1999) 69 Cal.App.4th 910, 927.)

B.  *Analysis*

Defendants claim the evidence is insufficient (1) to establish an exception to the general rule that statements of opinion or predictions of future conduct by a third party are not statements of fact that are actionable as fraud, and (2) to support the jury's findings that Andjelka and Vojo reasonably relied on representations Defendants made in the May 2004 transmittal letter.  This claim is unavailing.

"In tort law, a representation ordinarily will give rise to a cause of action for fraud or deceit only if it is a representation of fact rather than opinion.  [Citation.] '[Predictions] as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.'"  (*Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.* (1988) 205 Cal.App.3d 1415, 1423 (*Nibbi Brothers, Inc.*).)

However, "there are exceptions to this rule:  '(1) *where a party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge*; (2) where the opinion is by a fiduciary or other trusted

24

person; [and] (3) where a party states his opinion as an existing fact or as implying facts which justify a belief in the truth of the opinion.'"  (*Cohen, supra,* 151 Cal.App.3d at p. 946, italics added.)

Here, Defendants assert the transmittal letter statement at issue here—the statement that, "[u]pon obtaining permanent financing on Poway City Centre, you [(Andjelka and Vojo)] will have the option of either continuing the [Travises'] payments or being paid off fully on the note"—"was not an assertion of an *existing fact . . .* which might be actionable as fraud, but rather, at most, was an offer made by the Travises to enter into some alternative financing arrangement with [Andjelka and Vojo] should some contingent event occur in the future, well after [the] pledge agreement would be executed."  Defendants ask this court to reject any argument by Plaintiffs that "an exception to the rule expressed in [*Nibbi Brothers, Inc.*, *supra,* 205 Cal.App.3d 1415,] existed because Lopez, as the Travises' attorney[,] inferentially had superior knowledge of the Travises' financial condition and likelihood to obtain that financing for their corporation."

Viewing the entire record in the light most favorable to the judgment entered in Plaintiffs' favor, as we must (*Nestle v. City of Santa Monica*, *supra*, 6 Cal.3d at p. 925), we conclude that Defendants have failed to meet their burden of showing that there is no substantial evidence to support a finding by a reasonable trier of fact that Lopez, the attorney who authored the May 2004 transmittal letter, "[held] himself out to be specially qualified" (*Cohen, supra,* 151 Cal.App.3d at p. 946), and the "other part[ies]"—Andjelka and Vojo—were "so situated that [they could] reasonably rely upon the former's superior

25

knowledge" (*ibid*.). Lopez testified at trial about his legal training and his almost 20 years of experience practicing law at various law firms as of May 2004 when he wrote the transmittal letter. He testified he previously had prepared another pledge agreement. Lopez also testified he had handled three loan transactions in excess of $10 million on behalf of the Travises. Dale Sanford, who worked for Matthew Travis, indicated at trial that he and Matthew Travis found Lopez to be an experienced and sophisticated attorney who was competent to negotiate the loan agreements on their behalf. Andjelka testified she read both the May 2004 transmittal letter, including the statement at issue here and the enclosed pledge agreement. She testified she was interested in that statement "because the [Poway City] Centre would be done, and *we would be paid in full*, and we would not have to have all of those hardships [and] worries." (Italics added.) She also testified she had some questions, Vojo asked her to call Lopez, and she spoke with Lopez by telephone. Specifically, Andjelka testified she "spoke with [Lopez] about entering [into the] pledge agreement," and "[h]e explained all of those question marks that I had on the pledge agreement." She further testified that, based on Lopez's explanations, "it sounded okay." Andjelka was asked on direct examination, "Would you have signed the pledge agreement and given up your interest in the Travis[es'] family home's equity if you had known that you were not going to get the stock pledged as security as well?" Andjelka replied, "No, I would not have signed it." Andjelka was asked whether she "[was] aware . . . that the Poway City Centre property was in default and had notices of default recorded against it in February 2004" before she signed the pledge agreement in June 2004, and she responded, "No." Andjelka was also asked, "Would you have entered

26

into this pledge agreement if you had known that this property had a notice of default against it?" She answered, "No."

Based on the foregoing substantial evidence which Defendants disregard, the jury returned special verdicts finding (among other things) that Lopez made a "false representation of an important fact or facts" to both Andjelka and Vojo, who reasonably relied on the false representation.

We conclude the record, when viewed in the light most favorable to the judgment, contains substantial evidence from which a reasonable trier of fact could find that Lopez, in preparing the transmittal letter and presenting it to Andjelka and Vojo, "[held] himself out to be specially qualified" (*Cohen, supra,* 151 Cal.App.3d at p. 946), and that Andjelka and Vojo were "so situated that [they could] reasonably rely upon [Lopez's] superior knowledge" (*ibid.*), such that the statement at issue here was actionable.

III. *SUFFICIENCY OF THE EVIDENCE REGARDING THE ELEMENT OF DAMAGES*

Defendants also claim that Plaintiffs "failed to prove an essential element of their [fraud] claim (damages) based upon the value of the real property security interest they claimed to have lost as a result of [Defendants'] conduct," because the court "allowed [an] incorrect measure of damages to be used as to the value of the Travises' property." In support of this claim, Defendants complain that the deed of trust on the Travises' Paseo Valle Alto property, which had secured the loans Andjelka and Vojo had made to the Travises, was reconveyed in June 2004 when Andjelka and Vojo signed the pledge agreement, but Plaintiffs' valuation expert, Jeffery Porter, "was not an appraiser" and he valued the loss of the security interest in that property not as of June 2004, but as of

27

November 10, 2004—five months later—when the Travises' sale of that property closed. Defendants' claim is unavailing.

A. *Background*

At trial Porter, a certified public accountant with a practice in forensic accounting, testified on behalf of the plaintiffs that he had been asked to calculate the amount of damages Andjelka and Vojo had suffered from the loss of the deeds of trust that secured the Travises' loan repayment obligations. Porter testified without objection to his opinion that "the proceeds that would have been available to [Andjelka and Vojo], had they not reconveyed their interest [in the Travises' residence], would have been $588,051.96." When the plaintiffs' counsel asked the court to admit Porter's written damages analysis into evidence, counsel for Geraci & Lopez objected on the grounds of "improper opinion and irrelevant." The court overruled the objections and admitted the exhibit.

Defendants later brought a motion to strike Porter's expert opinion testimony. At the hearing, defense counsel claimed that Porter's opinions were "inappropriate from the standpoint of improper opinions as far as Defendants are concerned," adding that "more importantly they are not relevant to any issue of damages in the case." Citing Evidence Code section 813, defense counsel asserted that, "since no opinion from either an appraiser or an owner as to the value of the [Travises's] property was rendered, in particular as of the date of the alleged misrepresentation, the essence of [Porter's] testimony is entirely irrelevant. The Evidence Code is rather specific that that is what is required. That is the measure of damages . . . [i]n an intentional or negligent misrepresentation case."

28

In opposition to Defendants' motion to strike Porter's opinion testimony, the plaintiffs' counsel argued that Evidence Code section 813 did not apply, adding that "[o]ur clients lost the $588,000 that they . . . otherwise would have received if they had not been bilked out of their deeds of trust. They received nothing in exchange. The measure of damages is the difference between what they received and that which they gave up."

The court denied Defendants' motion to strike, explaining that Defendants had cited no authority for the proposition that expert testimony from a real estate appraiser was required to establish damages in this case.

After the jury returned their verdicts, Defendants brought a motion for new trial. As pertinent here, Defendants argued that, "[i]n regard to damages, plaintiffs' claim was based upon the argument that they would have foreclosed on the Travis[es'] residence but for Lopez's letter and that as a result they lost the value of what they would have received had they foreclosed. No evidence was presented as to the value of the residence as of May 24, 2004 through a foreclosure sale." Asserting that "[t]here [was] insufficient evidence to support the jury's award of damages," Defendants cited Evidence Code section 813 for the proposition that in order to meet their burden of proof as to damages, "plaintiffs first had to present testimony from either the owner of the Travis property or a qualified expert as to the value of the Travis home." Defendants claimed that, "[i]n this case Plaintiffs failed to provide any competent evidence concerning the value of the Travis property on any date. The only expert called was [Porter,] an expert in accounting. He acknowledged he had no expertise in valuing real property. All he did

29

was assume the value of the property was what it sold for in November 2004. What the house sold for in November 2004 is not admissible evidence of its value without either an owner or expert testifying as to its value. Nor did plaintiffs ask the owner, Launi Travis[,] to value her property. They called no witnesses who could or did competently testify as to the value of the Travis property. As a result, they failed to establish their damages by more than mere speculation."

In written opposition to these arguments, the plaintiffs asserted that "Defendants seemingly think the requirements of Evidence Code [section] 813 cannot be met by proof that the owners of the [Travis] property sold it for $2,675,000.00 on November 10, 2004. Nothing about this arm[']s length sale suggest[s] it did not constitute a sale by a willing seller under no duress to close the sale to a willing buyer under no duress to close the sale. Defendants['] argument that '[w]hat the house sold for in November of 2004 is not substantial evidence of its value without either an owner or expert testifying as to its value' is unsupported by authority." Defendants argued that "[n]o authority has been cited for the proposition that the law requires expert witness testimony of value of real property where there is a substantially contemporaneous arm[']s length good faith sale of that property. The jury was entitled to rely on the November 10, 2004 sale as proof of value of that which the Plaintiffs lost . . . ."

Following a hearing on various posttrial motions, including Defendants' new trial motion, the court issued its rulings in a minute order. The court denied Defendants' motion for a new trial, finding that, "[f]or the reasons stated" by the plaintiffs in opposition to Defendants' claim that the evidence was insufficient to support the award of

30

damages, "[t]here was adequate admissible evidence before the jury to support the damages awarded."

B. *Analysis*

Complaining that Porter "was not an appraiser" and had no expertise in valuing real property, Defendants suggest his opinion testimony on the issue of damages was inadmissible because it "failed to satisfy the specific requirements of Evidence Code section 813[, subdivision (a)]," which provides in part:

> "The value of property may be shown only by the opinions of any of the following: [¶] (1) Witnesses qualified to express such opinions. [¶] (2) The owner or the spouse of the owner of the property or property interest being valued. [¶] (3) An officer, regular employee, or partner designated by a corporation, partnership, or unincorporated association that is the owner of the property or property interest being valued, if the designee is knowledgeable as to the value of the property or property interest."

However, as Plaintiffs point out in their respondents' brief, section 823 of the same article of the Evidence Code ("Evidence of Market Value of Property") provides that, "Notwithstanding any other provision of this article, the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable." Plaintiffs argue that, "[t]here being no relevant, comparable market for deeds of trust independent from an associated obligation," it was "just and equitable" in this case to establish the value of the security released through the recorded June 15, 2004 reconveyance of the deed of trust "by reference to a nearly contemporaneous sale of the [Travises'] underlying real property."

31

We conclude that Evidence Code section 823 is applicable here and that it was just and equitable under that section for the plaintiffs to establish the value of the security interest in the Travises's residence, which the plaintiffs lost through means the jury found to be fraudulent, by reference to the nearly contemporaneous sale of that property in November 10, 2004, less than five months after the reconveyance of the subject deed of trust was recorded on June 15, 2004.

Defendants' complaint that Porter improperly valued the loss of the security interest based on the sale of the Travises' property in November 2004 is also unavailing. On cross-examination, defense counsel asked Porter, "So the entirety of your opinion is based upon a[n] arm's-length transaction which occurred in November of 2004 where the same property sold for [$]2,675,000?" Porter answered, "Yes." In an apparent reference to the date of the May 2004 transmittal letter, defense counsel then asked Porter, "And you assumed that that value related back to May of 2004 as part of your opinions." Porter replied, "Yes." Porter explained, "That's a reasonably short period of time and wouldn't necessitate an appraisal of the property, in my opinion." The November 2004 sale price of the Travises' property established its market value as of that date, and the fact that the sale occurred less than five months after the recording of the reconveyance of the deed of trust goes to the weight, not the admissibility, of Porter's testimony.

For all of the foregoing reasons, we reject Defendants' claim that the jury's award of damages is not supported by substantial evidence.

32

IV. *DENIAL OF DEFENDANTS' MOTION FOR OFFSET* (*CODE CIV. PROC., § 877*)

Defendants also contend the court erred in denying their posttrial offset motion in which they "[sought under section 877 of the Code of Civil Procedure] credits for the settlements [that the plaintiffs] previously reached both with Launi Travis and with the Estate of [Matthew] Travis."  In support of this contention, Defendants assert that, "as the damage[s] [the plaintiffs] sought from [Defendants] and the Travises at trial was the value of the security [the plaintiffs] claimed they lost after executing the pledge agreement (approximately $588,000)," Defendants "were entitled to offset the entire amount in light of the higher amount of proceeds [the plaintiffs] had already recovered from the Travises [($965,444)] prior to trial."  For reasons we shall explain, we conclude the court properly denied Defendants' offset motion.

A.  *Background*

1.  *Stipulated judgment against Launi Travis*

In early July 2009, defendant Launi Travis stipulated to the entry of a judgment against her on the complaint in this case in the amount of $1.5 million, which included "all costs and attorney[] fees to which plaintiffs ha[d] claimed entitlement," and the court ordered that the stipulated judgment be entered.

2.  *Settlement agreement between the administrator of Matthew Travis estate and the plaintiffs* (*Andjelka and Imelda*)

In late July 2009, E. David Wininger, as the administrator of defendant Matthew Travis's estate, negotiated and entered into a settlement agreement and mutual release (the settlement agreement) with plaintiffs Andjelka and Imelda.  As pertinent here, the

settlement agreement stated that "the settling parties in this agreement [were] desirous of reaching a full and final settlement of *all matters* arising out of the facts and circumstances related to [this case] and avoiding the expense and inconveniences of further or additional litigation." (Italics added.) It also stated that "the parties . . . disput[ed] their respective rights and liabilities arising out of and relating to *all claims* . . . and desire[d] to compromise and settle same." (Italics added.) The settlement agreement also provided that, upon its execution by the parties and their attorneys, Andjelka would "file a petition with the Probate Department of the San Diego Superior Court seeking approval of settlement of [Andjelka's and Imelda's] claims by joint and several allowance of [their] claims against the Estate of [Matthew Travis] and the Matthew Travis Trust . . . *in an amount equal to the unpaid principal, accrued interest at the contracted rate and late fees on the NOTES* as of the date of filing of the petition for approval . . . ." (Italics added.)

      a. *Approval of the settlement agreement by the probate court*

      Pursuant to the terms of the executed settlement agreement, Andjelka thereafter filed an unopposed petition (*Estate of Hardy Matthew Travis* (Super. Ct. San Diego County, 2007, No. 37-2007-00101607-PR-PL-CTL)) seeking approval of the agreement. The probate court (the Hon. Gerald C. Jessop)) granted the petition, finding that the administrator of Matthew Travis's estate "ha[d] negotiated [a] settlement that will result in a claim being honored *only for the principal amounts and unpaid late charges remaining due on the promissory notes* [*and*] *the interest accrued thereon to the date of*

34

*hearing on this petition*" (italics added), and also finding that "[t]he proposed compromise and settlement [was] equitable and just."  (Italics added.)

3. *Motion for determination of good faith settlement by the administrator of Matthew Travis's estate*

The administrator of Matthew Travis's estate brought a motion under Code of Civil Procedure section 877.6 for a determination that the settlement with the plaintiffs, Andjelka and Imelda, was entered into in good faith, and for an order that Launi Travis's cross-complaint be dismissed concurrently with Andjelka and Imelda's dismissal of their action against the administrator.  The court granted the unopposed motion.

4. *Jury's verdicts*

In November 2011 the jury returned special verdicts in favor of the plaintiffs on their causes of action for intentional and negligent misrepresentation, awarding compensatory damages to each of the two plaintiffs in the amount of $294,000, for a total of $588,000 in compensatory damages.

5. *Denial of Defendants' posttrial motion for offset/credit* (*Code Civ. Proc., § 877*)

a. *Motion*

Defendants brought a posttrial motion under Code of Civil Procedure section 877 (discussed, *post*) seeking an offset or credit for the sums of money the plaintiffs received both from Launi Travis pursuant to the stipulated judgment that the court entered against her, and from the estate of Matthew Travis pursuant to the settlement agreement. Asserting that the plaintiffs' complaint "sought relief for one injury, i.e., the loss of the security in the [Travises'] property" and it "allege[d] that the [Travises were] jointly and

35

severally liable with [Defendants] for that loss of security," Defendants claimed the verdict against them should be reduced to $0, and they should be deemed the prevailing parties entitled to recover their costs, because the plaintiffs had received from Launi Travis and the estate of Matthew Travis the total sum of $965,445, which "exceed[ed] the amount of the verdict plaintiffs [had] obtained against [Defendants] in the amount of $588,000."

    b. *The plaintiffs' opposition*

Andjelka and Imelda opposed the motion on various grounds. First, they argued that the purpose of Code of Civil Procedure section 877 is to preclude a double recovery from joint tortfeasors for damages arising out of the same injury, but "[t]here is no possibility of a double recovery under the facts of this case as the [estate of Matthew Travis] is closed and Launi Travis has received a bankruptcy discharge"; and the statute "operates to deny double recovery, not to credit a tortfeasor for amounts collected on independent contractual liability." Second, they argued that section 877 of the Code of Civil Procedure applies only to releases, dismissals, or covenants not to sue; and, here, "[t]he judgment against Launi Travis is not a release, dismissal or covenant not to sue." Third, they argued that their settlement with the estate of Matthew Travis "resulted in a claim being honored only for the principal amounts and unpaid late charges remaining due on the promissory notes"; and, thus, the amounts collected from Matthew Travis's estate "do not fall within Code of Civil Procedure [section] 877 because they are based upon a contractual obligation not a tort, liability for which was expressly denied."

36

c. *Ruling*

The court denied Defendants' motion for an offset against the $588,000 in compensatory damages the jury had awarded against them and in favor of the plaintiffs. The court first found that Code of Civil Procedure section 877 did not apply to the money collected from Launi Travis because the collections from her were the result of a stipulated judgment, not the result of a "release, dismissal with or without prejudice, or a covenant not to sue" as required by the statute.

The court also found that Code of Civil Procedure section 877 did not apply to the money collected from the estate of Matthew Travis. The court explained that "[u]nder its express terms, [section 877 of the Code of Civil Procedure] only applies to the settlement with [Matthew Travis's estate] if Matthew Travis was a 'tortfeasor[] claimed to be liable for the same tort,' or [Defendants] were ['co-obligors'] with [him] on the note[s]"; but, here, it was "undisputed that Lopez and his law firm were not co-obligors on the note[s]." The court also explained that "[t]he complaint plainly alleged that Matthew [Travis] was jointly liable with Lopez for misrepresentation. Thus, under the case law . . . ., the question [was] whether the settlement with the [estate of Matthew Travis] was allocated to the note indebtedness only, and <u>not</u> to the fraud claims. The court finds that it was." In support of the court's finding that *the settlement was allocated to the indebtedness on the promissory notes that the Travises breached, not to Defendants's tort liability*, the court cited the settlement agreement and Judge Jessop's probate court order approving the settlement.

37

The court also explained that Defendants' motion "fail[ed] to distinguish between amounts collected from Launi [Travis] pursuant to the stipulated judgment and amounts received in settlement from [Matthew Travis's estate]," and found that Defendants, by "impermissibly lumping the two together," had "failed to carry their burden of showing exactly what credit they [were] theoretically entitled to."

Last, the court explained that Defendants had "assert[ed], and it [was] not seriously controverted, that plaintiffs [had] collected about $577,000 from [Matthew Travis's estate] and about $388,000 from Launi [Travis]," for a total of about $965,000.[9] The court found that, "[a]gainst an economic loss of $1.5 million, it is hard to argue that the jury's verdict totaling $588,000 will result in a double recovery . . . ."

B. *Applicable Legal Principles*

Code of Civil Procedure section 877, subdivision (a) provides that "a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment" that is "given in good faith before verdict or judgment to *one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more co-obligors* mutually subject to contribution rights" shall "*reduce the claims against the others* in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."  (Italics added.)

---

9    At the hearing on Defendants' offset motion, the court asked, "What are the total collections from the Matthew Travis estate?"  Geraci & Lopez's counsel replied, "$577,114.20."  The court then asked, "Okay.  And how much from Launi [Travis]?"  Counsel responded, "$388,331.10."  Thus, the record shows the combined collections totaled about $965,445.

38

Thus, Code of Civil Procedure section 877, subdivision (a) governs offsets for pretrial settlements reached with either joint tortfeasors who are allegedly liable for the same tort, or with co-obligors who are mutually subject to contribution rights. (*Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1318.) "[T]he relevant language of [Code of Civil Procedure] section 877[, subdivision] (a) . . . presupposes the existence of multiple defendants jointly liable for the same damages." (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 63.)

The fundamental purpose of Code of Civil Procedure section 877, subdivision (a) is to "preclude a double recovery arising out of the same wrong and encourage settlements." (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 517.) "[N]onsettling defendants are entitled, as a matter of right, to reduce their liability to a plaintiff in the amount of the credit provided by [Code of Civil Procedure] section 877." (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1046.) "[I]f a plaintiff's settlement completely offsets a damage award against a nonsettling joint tortfeasor or co-obligor, 'it reduces the judgment to zero by operation of law.'" (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1333.)

C. *Analysis*

In denying Defendants' motion for an offset in the amount of $965,445 against the total of $588,000 in compensatory damages the jury awarded against them after finding them liable for intentional and negligent misrepresentation, the court correctly determined that Code of Civil Procedure section 877 does not apply to either the money collected from Launi Travis as a result of the pretrial stipulated judgment entered against

39

her ($388,331; see fn. 8, *ante*), or to the money collected from the estate of Matthew Travis under the pretrial settlement agreement the administrator of that estate negotiated with the plaintiffs ($577,114; see fn. 8, *ante*). We begin our analysis by noting that although Defendants and the Travises were alleged joint tortfeasors under the causes of action for intentional and negligent misrepresentation ultimately tried to the jury following remand, they were not alleged co-obligors under the causes of action for breach of the promissory notes because those two claims were brought only against the Travises.

For Defendants to be entitled to an offset in the amount of money the plaintiffs collected from Launi Travis following entry of the stipulated judgment against her, by statute the money must have been received as a result of "a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment" given pretrial in good faith by the plaintiffs. (Code Civ. Proc., § 877, subd. (a).) However, as the court correctly found, the subject stipulation for judgment and order thereon at issue here shows on its face that it was a simple stipulated judgment, not a negotiated release, dismissal, covenant not to sue, or covenant not to enforce a judgment within the meaning of the statute. Thus, we conclude the court correctly determined that Code of Civil Procedure section 877 does not apply to the money the plaintiffs collected from Launi Travis under the stipulated judgment, and Defendants are not entitled to an offset in the amount of the money received from her.

For Defendants to be entitled to an offset under Code of Civil Procedure section 877, subdivision (a) in the amount of the money the plaintiffs collected from the estate of Matthew Travis under the pretrial settlement agreement the administrator of that estate

40

negotiated with the plaintiffs, Defendants must establish that the money received was allocated to Matthew Travis's tort liability as an alleged joint tortfeasor with respect to the causes of action for intentional and negligent misrepresentation, and not to his alleged liability for breach of the promissory notes. This is Defendants' burden on appeal because, as already discussed, Code of Civil Procedure section 877, subdivision (a) governs offsets for pretrial settlements reached with either joint tortfeasors who are allegedly liable for the same tort, or with co-obligors who are mutually subject to contribution rights. (*Ehret v. Congoleum Corp., supra,* 73 Cal.App.4th at p. 1318.) Here, as the court correctly found, it is undisputed that Defendants and Matthew Travis were not alleged co-obligors on the promissory notes the Travises allegedly breached. Defendants were not parties to those notes, and (as noted) the plaintiffs' causes of action for breach of the promissory notes were brought only against the Travises. However, the complaint plainly alleged that Defendants and Matthew Travis were jointly liable for misrepresentation. Thus, the issue we must decide is whether the court correctly found that the plaintiffs' settlement with the estate of Matthew Travis was allocated to his alleged liability for breach of the promissory notes. If the proceeds of that settlement were allocated to pay what Matthew Travis (but not Defendants) allegedly owed on the promissory notes, then Code of Civil Procedure section 877, subdivision (a) does not apply to the amount of the money the plaintiffs collected from the estate of Matthew Travis under the pretrial settlement agreement the administrator of that estate negotiated with them, and Defendants are not entitled to an offset under that statute in the amount of those proceeds.

41

We conclude that substantial evidence supports the court's finding that the proceeds of the plaintiffs' settlement with the estate of Matthew Travis were allocated to Matthew Travis's alleged liability for breach of the promissory notes and not to his alleged joint tort liability for misrepresentation. The settlement agreement provided that, upon its execution, Andjelka would "file a petition with the Probate Department of the San Diego Superior Court seeking approval of settlement of [Andjelka's and Imelda's] claims by joint and several allowance of [their] claims against the Estate of [Matthew Travis] and the Matthew Travis Trust . . . *in an amount equal to the unpaid principal, accrued interest at the contracted rate and late fees on the NOTES* as of the date of filing of the petition for approval . . . ." (Italics added.) This clear language in the settlement agreement plainly indicates that the parties to that agreement allocated the settlement proceeds to the causes of action for breach of the promissory notes that the plaintiffs brought against Matthew Travis but not against Defendants. Although, as Defendants point out, the settlement agreement also stated that the settling parties desired to reach a "full and final settlement" of "all matters" and "all claims" in this case, nothing in the plain meaning of this quoted language or any other language contained in the settlement agreement suggests that the settlement proceeds were to be allocated to pay for Matthew Travis alleged joint tort liability.

The probate court's order approving the settlement also supports the trial court's finding that the proceeds of the plaintiffs' settlement with the estate of Matthew Travis were allocated only to Matthew Travis's alleged liability for breach of the promissory notes. Specifically, that order shows that Judge Jessop found that the administrator of

42

Matthew Travis's estate "ha[d] negotiated [a] settlement that will result in a claim being honored *only for the principal amounts and unpaid late charges remaining due on the promissory notes* [*and*] *the interest accrued thereon to the date of hearing on this petition*."  (Italics added.)

Quoting *Dillingham Construction N.A., Inc. v. Nadel Partnership, Inc.* (1998) 64 Cal.App.4th 264, 288 (*Dillingham*), Defendants assert that "where a plaintiff and settling defendant fail to allocate the consideration paid to a particular cause of action, the nonsettling defendants are '"entitled to a setoff of the entire settlement figure."'"  (Italics omitted.)  In that case, the Court of Appeal explained that "where the settling parties have failed to allocate, the trial court must allocate in the manner which is most advantageous to the nonsettling party."  (*Dillingham*, at pp. 287-288, citing *Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825.)  Defendants' reliance on *Dillingham* is unavailing because, here, the settling parties did allocate the settlement proceeds to contract-based causes of action, none of which was asserted against Defendants.

Thus, we conclude that Code of Civil Procedure section 877, subdivision (a) does not apply to the amount of the money the plaintiffs collected from the estate of Matthew Travis under the pretrial settlement agreement the administrator of that estate negotiated with them, and Defendants are not entitled to an offset under that statute in the amount of those proceeds.

For all of the foregoing reasons, we affirm the court's order denying Defendants' motion.

43

V. *ATTORNEY FEES AWARD*

Last, Defendants contend the court "erred as a matter of law in awarding [Plaintiffs] their attorney[] fees under the 'tort of another' doctrine." For reasons we shall explain, we strike the award because the court erred in awarding attorney fees to Plaintiffs under that doctrine.

A. *Background*

In their postrial motion, Plaintiffs requested that the court award them reasonable attorney fees against Lopez's codefendant, Geraci & Lopez, only under the "tort of another" doctrine. The court granted the motion and awarded fees to Vladimir in the amount of $204,650 and to Imelda in the amount of $65,969.

B. *Applicable Legal Principles*

Under Code of Civil Procedure section 1021, each party must bear his or her own attorney fees unless a statute or agreement of the parties provides otherwise. However, one of several judicially created exceptions to this general rule is the "tort of another" (or "third party tort") doctrine found in section 914 of the Second Restatement of Torts, which California has adopted. (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620-621 (*Prentice*); *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 78-79 (*Gorman*).) Under that doctrine, "[a] person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney[] fees, and other expenditures thereby suffered or incurred." (*Prentice*, *supra*, at p. 620.)

44

However, an award of attorney fees may not be imposed under the tort of another doctrine against a defendant who is one of multiple tortfeasors each of whom is jointly and severally liable to the plaintiff for commission of the same tort. (*Gorman*, *supra*, 178 Cal.App.4th at p. 80; *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 57.)

C. *Analysis*

Here, the complaint shows that Plaintiffs' causes of action for intentional and negligent misrepresentation as alleged in the complaint sought to hold the Travises, Lopez, and Lopez's law firm, Geraci & Lopez, jointly liable for these torts. As already discussed, a pretrial stipulated judgment was entered against Launi Travis, the administrator of Matthew Travis's estate entered into a negotiated pretrial settlement with the plaintiffs, and the jury found both Lopez and Geraci & Lopez liable on the misrepresentation causes of action.

Thus, the codefendant against whom the court imposed the award of attorney fees, Geraci & Lopez, is one of two tortfeasors whom the jury found to be jointly and severally liable to Plaintiff for commission of the same torts. Accordingly, we conclude the fee award must be stricken because the court erred in imposing the award of attorney fees against Geraci & Lopez under the tort of another doctrine. (*Gorman*, *supra*, 178 Cal.App.4th at p. 80; *Vacco Industries, Inc. v. Van Den Berg*, *supra*, 5 Cal.App.4th at p. 57.)

45

DISPOSITION

The award of attorney fees in favor of Plaintiffs and against Geraci & Lopez is stricken.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

NARES, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.

46